UNITED STATES of America

v.

Lewis C. ECKER, II, Appellant.

No. 75–1074.

United States Court of Appeals,
District of Columbia Circuit.

Argued 31 Oct. 1975.

Decided 2 April 1976.

Rehearing En Banc Denied 16 July 1976.

Certiorari Denied Jan. 17, 1977.
See 97 S.Ct. 788.

W. Anthony Fitch, Washington, D. C., with whom Frederick H. Weisberg, Washington, D. C. (both appointed by this Court) was on the brief for appellant.

Mary-Elizabeth Medaglia, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Roger M. Adelman, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Before LUMBARD,* Senior Circuit Judge for the Second Circuit, WRIGHT and WILKEY, Circuit Judges.

Opinion for the Court ** filed by Circuit Judge WILKEY.

Concurring opinion filed by Circuit Judge LUMBARD.

Dissenting opinion filed by Circuit Judge J. SKELLY WRIGHT.

WILKEY, Circuit Judge:

This appeal is from an order entered 27 December 1974 by the district court denying a request by the superintendent of Saint Elizabeths Hospital for the conditional release of one of the hospital's mental patients, Lewis C. Ecker, II.[1] Appellant Ecker urges this court to reverse the decision of the district court and direct that court to order his conditional release in accordance with the conditions outlined in the superintendent's recommendation.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

** Judge Lumbard concurs with Judge Wilkey in all but Part IV, Burden of Proof, of the court's opinion. As to Burden of Proof, Judges Lumbard, Wright, and Wilkey express separate views. There is no opinion for the court on this issue.

1. *United States v. Ecker,* Criminal Case No. 1481–67 (D.D.C.1974), Appendix for Appellee (App.) at 1.

He bases his attack on the district court's findings of facts and conclusions of law on four separate grounds. Appellant argues (1) that the district court applied an improper standard of review and, regardless of the proper standard, made findings of fact and conclusions of law not based on evidence in the record; (2) that the trial court erred in placing the burden of proof on the patient in this conditional release proceeding; (3) that rejection of the hospital's prescription of conditional release unlawfully deprived appellant of his statutory right to treatment; and (4) that the requirement of district court approval for hospital-initiated, conditional release proposals deprived appellant of equal protection of the laws. We find that the district court was correct in its actions, tested against all four issues raised, and therefore affirm its judgment.

## I. FACTUAL BACKGROUND

On 22 May 1967 a twenty-four year old senatorial aide was brutally raped and murdered in her apartment in Southwest Washington, D. C. Six days later Lewis C. Ecker, II, was arrested and charged with commission of these offenses. Upon Ecker's motion for a mental examination to determine his competency to stand trial and his mental condition at the time of the alleged offenses, an order issued transferring appellant from the District of Columbia Jail to Saint Elizabeths Hospital. After almost three months of examination the hospital staff members involved with the case unanimously agreed that appellant was mentally ill, but competent to stand trial, and that the alleged offenses, if committed by him, were caused by his mental illness. Appellant's condition was tentatively diagnosed as sociopathic personality disturbance, sexual deviation (sadism) (with organic features). In addition, the chairman of the

hospital staff conference on Ecker's competency concluded that appellant was "one of the sickest people we've ever had in this hospital." [2]

Having been found competent to stand trial, appellant elected to waive a jury and submit his case to the court on stipulated facts. Judge John L. Smith of the United States District Court for the District of Columbia found Ecker not guilty by reason of insanity on separate counts of felony murder and rape. At the hearing held immediately thereafter to determine appellant's present mental state, Judge Smith concluded that Ecker was suffering from a mental illness and if released, he would be likely to injure himself or others.[3] Accordingly, Ecker was committed to Saint Elizabeths Hospital pursuant to 24 D.C.Code § 301(d)(1).[4]

On 4 January 1973 a letter from the superintendent of Saint Elizabeths Hospital recommending appellant's conditional release was filed in the district court. The superintendent asked the court to approve a conditional release program whereby appellant could attend vocational classes in Arlington, Virginia, and visit his parents' home without hospital supervision. At a hearing on 30 January 1973 the government opposed that portion of the hospital's proposal recommending unsupervised home visitation and took no position on the proposed educational program other than seeking to insure that it was narrowly circumscribed and carefully supervised. Dr. George Saiger, a staff psychiatrist at the hospital and the author of the conditional release proposal, was the only witness at the hearing. At the close of the hearing Judge Smith denied the hospital's conditional release proposal *in toto*.

Appellant noted an appeal to this court and moved for summary reversal on the

2. Stipulation No. 4 filed in *id.,* App. at 15.

3. *United States v. Ecker,* Criminal Case No. 1481–67 (D.D.C.1968), App. at 16.

4. The statute provides as follows:
 If any person tried upon an indictment or information for an offense raises the defense

of insanity and is acquitted solely on the ground that he was insane at the time of its commission, he shall be committed to a hospital for the mentally ill until such time as he is eligible for release pursuant to this subsection or subsection (e).
24 D.C.Code § 301(d)(1) (1973).

ground that the district court had abused its discretion in denying the hospital's proposal. On 29 May 1973 this court denied appellant's motion and sua sponte summarily affirmed the decision of the district court.[5]

Only three months after this court's decision in *Ecker I* the superintendent of Saint Elizabeths again certified that appellant was ready for conditional release. The second conditional release proposal differed from the first proposal only in that it outlined several stages whereby appellant's access to the community could be gradually increased at the hospital's discretion. Throughout all stages appellant would be required to live at the hospital and participate in therapy there, but from the first day of his conditional release there would be unsupervised contact with the community.

The government objected to this second proposal, and pursuant to section 24 D.C. Code § 301(e)[6] a hearing was held in the district court. Four expert witnesses testified at this hearing, and all four recommended court approval for the hospital's conditional release request. Three of these witnesses were psychiatrists called by the defense; the fourth was a psychologist called by the government. Judge Smith took the matter under advisement, and on 27 December 1974 entered findings of fact and conclusions of law and an order denying the hospital's proposal.

## II. STANDARD OF REVIEW

Ecker complains that the district court applied an overly broad standard of review when it decided to reject the conditional release program proffered by Saint Elizabeths Hospital. In support of his position appellant primarily relies on *Tribby v. Cameron*.[7] Like Ecker, the patient in *Tribby* was committed pursuant to 24 D.C.Code

§ 301(d)(1), which provides that a person tried on a criminal charge and acquitted solely on the ground that he was insane at the time of the offense shall be confined in a hospital for the mentally ill. When the patient in *Tribby* filed a writ of habeas corpus complaining that he was not receiving adequate treatment, this court held that he was entitled to a hearing and findings on the issue of treatment and remanded the case for further proceedings. In determining the adequacy of the patient's treatment, Senior Judge Edgerton suggested that on remand the district court should apply the following standard of limited judicial review:

> We do not suggest that the court should or can decide what particular treatment this patient requires. The court's function here resembles ours when we review agency action. We do not decide whether the agency has made the best decision, but only make sure that it has made a permissible and reasonable decision in view of the relevant information and within a broad range of discretion.[8]

We find no basis for concluding that this narrow standard of review on the issue of adequate treatment also applies to hospital certifications for conditional release. *Tribby* was a "decision relat[ing] essentially to the *internal* administration of the hospital"[9] and did not involve the public safety considerations inherent in a conditional or unconditional release proposal. When a district court is asked to review the medical judgment of a hospital staff on a question of internal administration its function does "resemble[ ] ours when we review agency action," and in deference to medical expertise the hospital should be allowed to operate "within a broad range of discretion." On the other hand, when a district court is asked to review a conditional release certification the basic policy underlying section

5. *United States v. Ecker (Ecker I),* 156 U.S. App.D.C. 223, 479 F.2d 1206 (1973).

6. Section 301(e) is quoted in its entirety at note 12 *infra.*

7. 126 U.S.App.D.C. 327, 379 F.2d 104 (1967).

8. *Id.* at 328; 379 F.2d at 105.

9. *Dixon v. Jacobs,* 138 U.S.App.D.C. 319, 327, 427 F.2d 589, 597 (1970) (emphasis added).

301(e) comes into play, and the court must decide whether the hospital's proposal "provide[s] treatment and cure for the individual in manner which affords reasonable assurance for the public safety." [10]

█ The narrow standard of review described in *Tribby* only applies when public safety is not a factor; it has no applicability in release proceedings (conditional or unconditional) under section 301(e).[11] To anticipate a bit what may be distilled from our decisions in this field, which we discuss below, the agency analogy is only pertinent within the hospital grounds. In that area we and the district court may give a degree of deference to the hospital's judgment equivalent to the deference we accord agency action; when, and if, the patient is to cross the hospital boundary, then other factors affecting the public come into play, and both the statute and our decisions impose a different role and far heavier responsibilities on the courts.

█ We turn now to an analysis of section 301(e) and the case law dealing with this statute. The language of the statute itself describes an active, rather than passive, role for the district court:

> [I]f, after a hearing and *weighing the evidence,* the court shall find that the condition of such person warrants his conditional release, the court shall order his release under such conditions as the court shall see fit, or, if the court does not so find, the court shall order such person returned to such hospital.[12]

Significantly for our purpose here, the language of section 301(e) with reference to

---

10. *Hough v. United States,* 106 U.S.App.D.C. 192, 195, 271 F.2d 458, 461 (1959).

11. Similarly, in *Covington v. Harris,* 136 U.S. App.D.C. 35, 419 F.2d 617 (1969) (en banc), this court faced another situation where a district court was asked to review a medical judgment affecting only the internal administration of Saint Elizabeths Hospital. In *Covington* the patient through a writ of habeas corpus sought transfer to a less restrictive ward of the hospital. Since public safety is not a significant consideration where a patient seeks transfer to another ward *within the hospital,* the court applied the standard of limited review announced in *Tribby. Id.* at 39, 419 F.2d at 621.

12. 24 D.C.Code § 301(e) (1973) (emphasis added). Section 301(e) provides in its entirety as follows:

> Where any person has been confined in a hospital for the mentally ill pursuant to subsection (d) of this section, and the superintendent of such hospital certifies (1) that such person has recovered his sanity, (2) that, in the opinion of the superintendent, such person will not in the reasonable future be dangerous to himself or others, and (3) in the opinion of the superintendent, the person is entitled to his unconditional release from the hospital, and such certificate is filed with the clerk of the court in which the person was tried, and a copy thereof served on the United States Attorney or the Corporation Counsel of the District of Columbia, whichever office prosecuted the accused, such certificate shall be sufficient to authorize the court to order the unconditional release of the person so confined from further hospitalization at the expiration of fifteen days from the time said certificate was filed and served

> as above; but the court in its discretion, may or upon objection of the United States or the District of Columbia shall, after due notice, hold a hearing at which evidence as to the mental condition of the person so confined may be submitted, including the testimony of one or more psychiatrists from said hospital. The court shall weigh the evidence and, if the court finds that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others, the court shall order such person unconditionally released from further confinement in said hospital. If the court does not so find, the court shall order such person returned to said hospital. Where, in the judgment of the superintendent of such hospital, a person confined under subsection (d) above is not in such condition as to warrant his unconditional release, but is in a condition to be conditionally released under supervision, and such certificate is filed and served as above provided, such certificate shall be sufficient to authorize the court to order the release of such person under such conditions as the court shall see fit at the expiration of fifteen days from the time such certificate is filed and served pursuant to this section: *Provided,* That the provisions as to hearing prior to unconditional release shall also apply to conditional releases, and, if, after a hearing and weighing the evidence, the court shall find that the condition of such person warrants his conditional release, the court shall order his release under such conditions as the court shall see fit, or, if the court does not so find, the court shall order such person returned to such hospital.

both conditional and unconditional release proceedings is almost identical; in each case the district court is to "weigh the evidence" after "a hearing" (if a hearing is desired by the government or the court), which is exactly what a district court does when deciding any matter de novo.

■ This court first construed the conditional release provision of section 301(e) in *Hough v. United States.*[13] In this case of first impression the court reversed the district court's order denying the hospital's conditional release proposal and directed the district court on remand to reconsider its order in light of this court's new construction of the statute. In *Hough* Judge Bazelon explained,

> We must construe [the conditional release provision of section 301(e)] in light of the basic policy underlying the statute. The policy, as we read the legislative history, is to provide treatment and cure for the individual in a manner which affords reasonable assurance for the public safety. Accordingly, we think that to order conditional release upon a challenged certification the court must conclude that the individual has recovered sufficiently so that under the proposed conditions—or under conditions which the statute empowers the court to impose "as [it] shall see fit,"—"such person will not in the reasonable future be dangerous to himself or others." This gives effect to the legislative distinction between conditional and unconditional release without diluting the statute's grant of judicial power to protect the public safety.[14]

Appellant contends that the district court is restricted to determining whether the hospital's certification for conditional release is supported by the record, i. e., "the

court must approve [his] conditional release if the evidence in the record provides a reasonable basis for the hospital's determination that conditional release is appropriate."[15] There is some language at the conclusion of *Hough* which can be read to support appellant's contention.[16] This language, however, must be read in context with the rest of Judge Bazelon's opinion. Appellant's interpretation belies the public safety considerations underlying Judge Bazelon's construction of the statute and seriously "dilut[es] the statute's grant of *judicial* power to protect the public safety."[17]

In its carefully considered construction of section 301(e)'s conditional release provision, the *Hough* court held that to order conditional release on a hospital recommendation challenged by the government the district court must conclude that the patient has sufficiently recovered so that under the specified conditions he will not in the reasonable future endanger himself or others.[18] Clearly, in *Hough* Judges Bazelon and Fahy recognize that the district court, not the hospital, has the final authority to decide whether a patient will be conditionally released, i. e., the district court is obligated to make its own independent judicial determination.

■ Similarly, in *United States v. McNeil,*[19] Judges Bazelon, MacKinnon and Robb also recognize that under section 301(e) the reviewing district court, as the trier of fact, must independently weigh and evaluate the evidence. Thus, the weight to be given any expert opinion admitted into evidence is exclusively for the judge, and the judge is not bound to accept the opinion of any expert witness or group of expert witnesses. Likewise, we view the hospital's

13. 106 U.S.App.D.C. 192, 271 F.2d 458 (1959).

14. *Id.* at 195, 271 F.2d at 461 (footnote omitted). The legislative distinction between conditional and unconditional releases, to which Judge Bazelon refers, is that only unconditional releases require a showing that the patient has recovered his sanity.

15. Brief for Appellant at 12 n. 12.

16. *See* 106 U.S.App.D.C. at 196, 271 F.2d at 462 (quoted in note 21 *infra*).

17. *Id.* at 195, 271 F.2d at 461 (emphasis added).

18. *Id.*

19. 140 U.S.App.D.C. 228, 230, 434 F.2d 502, 504 (1970).

certification in the instant case as an amalgamation of expert opinion which the trial judge must weigh along with all other evidence in the record before he reaches his conclusion under section 301(e). On the other hand, as Chief Judge Bazelon emphasized in his concurrence in *McNeil*,

> This judicial supervision . . . does not entitle the trial court to substitute its own opinions for uncontradicted expert testimony. Determination of the patient's present mental condition, and of the behavior in which he may be expected to engage if released, must be made on the basis of the expert testimony in the record. Given the facts established by that testimony, including of course, the necessary resolution of any relevant conflicts, the function of the trial court is to determine if these facts measure up to the statutory standards for release.[20]

We need only add to Judge Bazelon's caveat that the district court's determination can be based on other evidence in the record besides expert testimony, e. g., the patient's hospital file, the court files and records in the case, and whatever illumination is provided by counsel.[21]

In *Dixon v. Jacobs*[22] this court again refrained from importing the *Tribby* standard into the procedures governing district court review of conditional release certifications:

> Where the challenged decision relates essentially to the internal administration of the hospital—as, for example, when a patient seeks to enforce his right to adequate treatment; when he seeks transfer to a less restrictive ward within the hospital; and, *perhaps*, when he seeks conditional rather than unconditional release— we have recognized "the responsibility the law places also upon those in charge of the institution." *Covington v. Harris, supra* [136 U.S.App.D.C.] at 47, 419 F.2d at 629. (Fahy, J., concurring). In such cases, judicial review is limited to the determination whether the administrator

---

**20.** *Id.* at 241, 434 F.2d at 515. It was no doubt this same concern that the district court must base its denial of release on evidence in the record and not arbitrarily substitute its own opinions for such evidence that prompted Judge Bazelon to conclude his opinion in *Hough* with the following note of caution:

> It should not be anticipated that the District Court would arbitrarily prevent the hospital authorities from utilizing temporary leaves for therapy in proper cases. The court would simply fulfill its statutory role by deciding whether or not the evidence supports the hospital's determination that in all reasonable likelihood the patient's temporary absence from the hospital under specified conditions will not endanger others.

106 U.S.App.D.C. at 196, 271 F.2d at 462. In any event, if *Hough* created some ambiguity with respect to the district court's scope of review, Judge Bazelon seems to clear the air with the last sentence of his concurrence in *McNeil*. There he states that "the function of the trial court is to determine if these facts [established by evidence in the record] measure up to the statutory standards for release." 140 U.S.App.D.C. at 241, 434 F.2d at 515. He does *not* state that the trial court's function is to determine whether the hospital's certification (that these facts measure up to the statutory standards for release) is supported by substantial evidence on the record considered as a whole. Similarly, earlier in *McNeil*, Judge Bazelon explained:

. . . Congress, in order to insure the integrity of the hospital's determination that the patient's condition meets the statutory standard for release, has provided that release must be preceded by a judicial determination that the statutory standards for release have been met.

. . . . .

[T]he point of requiring judicial supervision of the release of patients hospitalized following acquittal of crime by reason of insanity is to protect the patient and the public by insuring that statutory standards for release are not subverted by allowing the ultimate determination to be made according to the individual, subjective standards of the hospital staff.

*Id.*, 140 U.S.App.D.C. at 239, 241, 434 F.2d at 513, 515 (footnote omitted).

**21.** Judge Bazelon implicitly recognized this in *Ecker I* where he upheld the district court's rejection of the hospital's uncontradicted expert opinion that Ecker was ready for conditional release. Although Dr. Saiger, the only expert witness at the first hearing, favored conditional release, Judge Bazelon found that several aspects of his testimony raised "real doubts about the sufficiency of the investigation of Ecker's condition, and the conclusions drawn therefrom that he was ready for [conditional release]." 156 U.S.App.D.C. at 225, 479 F.2d at 1208.

**22.** 138 U.S.App.D.C. 319, 427 F.2d 589 (1970).

"has made a permissible and reasonable decision in view of the relevant information and within a broad range of discretion." *Tribby v. Cameron,* 126 U.S.App. D.C. 327, 328, 379 F.2d 104, 105 (1967). The underlying question is to be decided not by the court, but by the hospital; and that decision cannot be meaningfully reviewed until the administrative process has run its course.

When the patient is seeking *complete* release from confinement, however, the scope of judicial review is broader. In such cases the function of the court is not simply to review the hospital's decision for unreasonableness, but rather itself to decide the ultimate question: whether the present status of the patient is such that continued confinement is justifiable.[23]

We take it that Judge Bazelon's usage of the word "perhaps" (italicized above) indicates that despite his prior authorship of *Hough,* Judge Bazelon (1) is refraining from even an expression of dicta on the proper scope of review for the district court in a conditional release proceeding and (2) is not convinced that *Tribby* supplies the proper standard. More recently, in *Ecker I,* Judge Bazelon again refused to adopt the *Tribby* standard in a conditional release proceeding under section 301(e).[24]

Perhaps it could be argued that the proper scope of district court review in cases involving individuals who have been committed under section 301(d) falls somewhere along a continuum, depending on the degree of public safety at stake. Under this analysis one could argue that district court review of unconditional releases should be broader than district court review of conditional releases since the former pose an even greater risk to public safety than the latter. This may be where our case law

stands at the present time. Certainty reigns at each end of the spectrum with *Tribby* and *Covington* firmly establishing the scope of review for medical judgments affecting only the internal administration of the hospital and *Dixon* establishing the standard of review for unconditional releases, *i. e.,* medical judgments significantly affecting the public safety. We see no reason why certainty can not also reign over the realm of conditional release proceedings. Therefore, we will attempt to state concisely what we see to be the district court's role in passing on hospital certifications for conditional release under section 301(e).

◾ It seems clear that the same policy rationale underlies judicial review of conditional and unconditional releases, *i. e.,* providing for the treatment and cure of the mentally ill in a manner which affords reasonable assurance for the public's safety.[25] Hence, we agree with Judge Bazelon's reading of legislative intent: The purpose of section 301(e) is to assure that members of appellant's exceptionally dangerous class are "kept under hospital restraint until the District Court, in the exercise of a discretion, reviewable in this Court, approves a relaxation of that restraint."[26] To best effectuate this sound legislative purpose behind the judicial review of conditional and unconditional release certifications, we conclude that both types of release proceedings should be governed by the broader standard of review articulated by Chief Judge Bazelon in *Dixon.*

◾ Thus, in conditional release proceedings (as well as unconditional release proceedings) the role of the district court (*i. e.,* the standard of review)

. . . is not simply to review the hospital's decision for unreasonableness, but

23. *Id.* at 327, 427 F.2d at 597 (dicta) (footnotes omitted and emphasis added).

24. 156 U.S.App.D.C. at 227, 479 F.2d at 1210.

25. *See Ragsdale v. Overholser,* 108 U.S.App. D.C. 308, 312, 281 F.2d 943, 947 (1960); *Hough*

v. *United States,* 106 U.S.App.D.C. at 195, 271 F.2d at 461.

26. *Hough v. United States,* 106 U.S.App.D.C. at 196, 271 F.2d at 462; *accord, United States v. McNeil,* 140 U.S.App.D.C. at 241, 434 F.2d at 515.

rather itself to decide the ultimate question: whether the present status of the patient is such that continued confinement [without conditional release] is justifiable.[27]

Continued confinement without conditional release is justifiable unless the district court determines under section 301(e)'s statutory standard that the patient will not in the reasonable future endanger himself or others.

 To avoid confusion here, it is important to identify two separate, but closely intertwined, "standards" that come into play when a district court reviews a hospital release certification—the "statutory standard" and the "standard of review." The proper "statutory standard" was announced in *Hough* when this court interpreted section 301(e)'s conditional release provisions as a matter of first impression.[28] On the other hand, until today's decision the "standard of review" issue had only been discussed in dicta.[29] Since our decision in this case necessarily involves both of the aforementioned standards, we will italicize that part of our holding that bears upon the standard of review and leave unitalicized that part involving the statutory standard: In order to approve a conditional release, we hold that *the district court must independently "weigh the evidence" and make a de novo determination* that the patient will

not in the reasonable future endanger himself or others.

We recognize that the statutory standard announced by Judge Bazelon in *Hough* differs slightly from the statutory standard he later describes in *Bolton v. Harris* and *Dixon*.[30] To the extent of any conflict, we adopt the *Hough* standard. Although substantially similar, it is not technically sufficient for the district court merely to find that the patient "is no longer *likely* to injure himself or other persons because of mental illness."[31] Rather, the court must find that the patient "will not in the reasonable future be dangerous to himself or others."[32] In other words, we agree with the reservations expressed by Judge Leventhal in his *Dixon* concurrence:

> The Code provides that the court shall release a person acquitted by reason of insanity "if the court finds that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others." 24 D.C.Code § 301(e). It may well be that in the case of a defendant who presents a substantial problem of danger in the reasonable future, by virtue of his mental condition, the finding in 301(e) cannot be made even though it cannot be said that this danger is "likely." I am not ready to say that this difference from the standard provided for those merely civilly committed

**27.** *Dixon v. Jacobs*, 138 U.S.App.D.C. at 328, 427 F.2d at 598.

**28.** 106 U.S.App.D.C. at 195, 271 F.2d at 461 (quoted in text accompanying note 14 *supra*).

**29.** *United States v. McNeil*, 140 U.S.App.D.C. at 239–41, 434 F.2d at 513–15 (Bazelon, C. J., concurring) (several dicta offering guidance to the district court on remand); *Dixon v. Jacobs*, 138 U.S.App.D.C. at 327–28, 427 F.2d at 597–98 (dictum: ". . . perhaps, when he seeks conditional release . . ."); *Hough v. United States*, 106 U.S.App.D.C. at 196, 271 F.2d at 462 (dictum offering guidance to the district court on remand). In none of these cases was it necessary for the court to reach the standard of review issue.

**30.** *Dixon v. Jacobs*, 138 U.S.App.D.C. at 328, 427 F.2d at 598; *Bolton v. Harris*, 130 U.S.App. D.C. 1, 12, 395 F.2d 642, 653 (1968). We also note that both *Bolton* and *Dixon* involved habe-

as corpus petitions seeking unconditional release and not hospital certifications seeking conditional (or unconditional) release. Nevertheless, since *Bolton* was an attack on the constitutionality of sections 301(d) and (e) and since *Dixon* involved a patient's failure to exhaust administrative remedies, both cases dealt with the issue of district court review under section 301(e).

**31.** *Dixon v. Jacobs*, 138 U.S.App.D.C. at 328, 427 F.2d at 598 (emphasis added); *accord, Bolton v. Harris*, 130 U.S.App.D.C. at 12, 395 F.2d 653. This "likely" standard is the statutory standard governing the release of involuntarily-committed *civil* patients. *See* 21 D.C.Code, §§ 545(b), 548 (1973). *See also* note 80 & text accompanying note 61 *infra*.

**32.** *Hough v. United States*, 106 U.S.App.D.C. at 195, 271 F.2d at 461.

. . . is repugnant to fairness or the Constitution.[33]

Today we answer one of the questions which Judge Leventhal chose to reserve. We hold that the existence of "a substantial problem of danger in the reasonable future" provides an adequate basis for the continued detention and confinement of an insanity acquitee who, like Ecker, has committed a violent criminal act—unless the district court can make an "affirmative finding that it is at least more probable than not that he will not be violently dangerous in the future."[34]

■ We turn now to the next stage of judicial review—the appeal before this court. At our level the standard of review is well settled: The trial court's "[f]indings of fact shall not be set aside unless clearly erroneous."[35]

## III. THE EVIDENCE

[13, 14] As we explained in the preceding section, in order to deny approval of the hospital's certification the district court was not required to, and in fact did not, find that Ecker was "likely" to injure himself or others if his conditional release was approved.[36] Instead, upon consideration of appellant's entire hospital file, the written and oral testimony of three psychiatrists and one psychologist, the court files and records in appellant's case, and the arguments of counsel, the district court properly found that it was

> unable to conclude that Mr. Ecker ha[d] recovered sufficiently so that under the proposed conditions of release (or any conditions which could reasonably be imposed) he would not in the reasonable future be dangerous to himself or others. This conclusion [was] made with particular reference to his mental illness, its chronic nature, the continuing existence of fantasies in his mind and his uncertain ability to deal with them, the continuing turmoil he is experiencing, and the incidents of his misbehavior in 1974 with respect to female patients at Saint Elizabeths Hospital.[37]

**33.** 138 U.S.App.D.C. at 332, 427 F.2d at 602. On "the question of what society may reasonably provide when the evidence, though strong, establishes only that a substantial problem exists and does not show a likelihood that danger will recur," Judge Leventhal further stated,

> I think the existence of a substantial problem is not an adequate basis to confine or detain a man who has never harmed his fellow man, never committed the physical elements of a crime. But I would like at least to reserve the question whether the existence of a substantial problem may be enough basis to detain and confine someone who (except for the doubt as to mental responsibility) has committed a criminal act, at least if an act of violence was involved—unless the court is prepared to make some affirmative finding that it is at least more probable than not that he will not be violently dangerous in the future.

*Id.* (footnote omitted).

**34.** *Id.* Note that we do not decide whether the *Hough* standard or the slightly less stringent "likely" standard applies to those patients whose crimes did not involve acts of violence. For a quick comparison of these two standards, see note 80 *infra.* Furthermore, we recognize that equal protection requires the standards governing the release of criminal acquitees, who have been confined for a period equal to the maximum sentence authorized for their crimes, to be substantially the same as the standards applicable to civil committees. *See Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); *Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966). Regarding the other equal protection ramifications of our decision see section V of this opinion *infra.*

**35.** Fed.R.Civ.P. 52(a).

**36.** We do not mean to suggest that the evidence on the record in this case would not support a finding that Ecker would be likely to injure himself or others if conditionally released. To the contrary, if the trial court had made such a finding, albeit entirely surplusage, the evidence here would amply support it. *See United States v. Snyder,* 174 U.S.App.D.C. 117, 529 F.2d 871 (1976), where the district court in a hospital-initiated, unconditional release proceeding went even further than likelihood and found that "if released into the community at the present time, [the patient] *would* pose a definite and distinct danger to the personal safety of others." 529 F.2d at 878 (quoting the district court) (emphasis added).

**37.** *United States v. Ecker,* Criminal Case No. 1481–67 (D.D.C.1974), App. at 2.

In dicta Chief Judge Bazelon has suggested the following procedure for courts when they

Judge Smith also made the following important findings of fact:

4. At the present time, Mr. Ecker is still suffering from a chronic mental illness, namely, antisocial personality disorder (with organic features), severe, and sexual deviation (sadism).

5. Mr. Ecker's fantasy life, observed upon his initial commitment at the hospital has continued in virtually the same quality and intensity up to the present time; this is evidenced by psychological tests conducted on him in 1971, 1972 and 1974.

6. In March, 1974, it was brought to the attention of authorities at Saint Elizabeths Hospital that Mr. Ecker was seeking out female patients in the deaf program at the movies and through a window on their ward. Members of the hospital staff express [sic] concern with this behavior, and Mr. Ecker was reprimanded.

7. In April, 1974, Mr. Ecker was reprimanded for improperly touching a female patient on the buttocks.

8. The plan submitted by the hospital for conditional release in the letter to the Court dated August 24, 1973, does not differ in material respects from the plan for release contained in the letter to the Court on December 28, 1972, which was rejected by the Court after a hearing held on January 30, 1973. In particular, both submissions propose that Mr. Ecker be released to attend school and to spend time at his parents' home. The release plan currently before the Court offers no improvements for the defects in the earlier plan since, among other things, it still does not provide adequate controls over Mr. Ecker during the periods he would be away from the hospital.[38]

Cognizant that this court has frequently remarked on the difficult and complex task facing a district court when it is asked to decide whether a patient at Saint Elizabeths will "in the reasonable future be dangerous to himself or others,"[39] we are satisfied that the trial judge's findings here meet the preliminary test, i. e., they "provide a framework adequate for appellate review."[40] For the final substantive test, on the record before this court we can not say that Judge Smith's conclusions on the issue of "dangerousness" were clearly erroneous or not based on evidence in the record.[41]

review hospital certifications under section 301(e):

> [T]he court must . . . examine possible conditions that may be placed upon the patient's release, and the extent to which those conditions may be expected to alleviate any harm that otherwise might result from the patient's unmodified behavior. If a combination of conditions may be found that would reduce the likelihood of dangerous behavior below the standard required for commitment, the court should order the patient's release upon these conditions.

*United States v. McNeil,* 140 U.S.App.D.C. at 239, 434 F.2d at 513 (footnotes omitted). Except in this and several other dicta, by Judge Bazelon, this court has never hinted that "it is the [district] court's duty to consider and impose such other conditions as will make conditional release acceptably safe." Dissent at —— of 177 U.S.App.D.C., at 203–204 of 543 F.2d Indeed, strong policy arguments could be made against encouraging judicial tampering in this area of medical expertise. Without deciding whether Judge Smith was obligated to make a finding on this issue, we note that he spoke to the question and found that "under the pro-

posed conditions of release (or any which could reasonably be imposed)" he could not rule in Ecker's favor on the issue of "dangerousness." *United States v. Ecker,* Criminal Case No. 1481–67 (D.D.C.1974), App. at 2.

38. *United States v. Ecker,* Criminal Case No. 1481–67 (D.D.C.1974), App. at 2.

39. *See, e. g., United States v. McNeil,* 140 U.S. App.D.C. at 239, 434 F.2d at 513 (Bazelon, C. J., concurring); *Dixon v. Jacobs,* 138 U.S.App. D.C. at 330, 427 F.2d at 600.

40. *United States v. McNeil,* 140 U.S.App.D.C. at 229, 434 F.2d at 503. This is not a case like *McNeil* where the trial court denied a conditional release in an unexplicated order.

41. This is the proper standard of review before this court. *See Cross v. Harris,* 135 U.S.App. D.C. 259, 264, 418 F.2d 1095, 1100 (1969); *United States v. McNeil,* 140 U.S.App.D.C. at 239–40, 434 F.2d at 513–14 (Bazelon, C. J., concurring); *United States v. Ecker,* 156 U.S. App.D.C. at 225, 479 F.2d at 1208. We do not weigh the evidence de novo.

While Judge Smith disagreed substantially with the opinions of the four expert witnesses who testified that the risk of danger to the community would be minimal if appellant were allowed to participate in the conditional release program, Judge Smith was informed of all the facts on which to base an opinion, and it was his obligation to make an independent determination. As both appellant and the government recognize, the issue of "dangerousness" presents the district court with a difficult mixed question of law and fact, and the court is under no obligation to accept the experts' opinions on questions of law. Chief Judge Bazelon made this indisputably clear in *Dixon* and *McNeil*,[42] as did Judges MacKinnon and Robb in the court's opinion in *McNeil*.[43]

Since we are not weighing the evidence do novo, we deem it unnecessary to repeat all of the details concerning appellant's mental condition which were brought out during the hearing below. Suffice it to say that the situation has changed very little since this court's last opinion in *Ecker I.* Quoting from Chief Judge Bazelon's remarks in that opinion, we again find that the testimony presented

> raises not only ambiguities, but real doubts about the sufficiency of the investigation of Ecker's condition, and the conclusions drawn therefrom that he was

ready for a dramatic increase in both responsibility and unsupervised leave time from the hospital.[44]

One of the factors emphasized by the court in support of the district court's first denial of certification was the inner turmoil still reflected in Ecker's psychological testing,[45] and again this turmoil was one of several motivating factors behind Judge Smith's decision below. All the witnesses at appellant's hearing testified that appellant continues to have an active fantasy life,[46] and the record indicates that these fantasies are frequently violent, sexual, and aggressive in nature.[47] Particularly noteworthy is Dr. Shapiro's characterization of appellant's present relationship with his fantasies:

> Personality tests point rather clearly to an active internal struggle in which Mr. Ecker is attempting to come to grips with a fantasy life both gratifying and frightening. . . . When he allows himself the liberty of pursuing his fantasies, his reality testing appears to become somewhat fluid, characterized by primary process ideation; clearly, this entire realm still represents a dangerous and potentially psychically disruptive force. Nevertheless, he is aware of the anxiety stirred up, and has the requisite ego control to set some distance, rather than to act out, in order to deal with the anxiety. His controls at present are characterized

42. The question of "dangerousness" is . . . mixed. The likelihood of future misconduct, the type of misconduct to be expected, and its probable frequency, are questions of fact; whether the expected harm, *and* its apparent likelihood, are sufficiently great to warrant coercive intervention under our statutes, are questions of law.
138 U.S.App.D.C. at 325 n. 17, 427 F.2d at 595 n. 17 (emphasis in original).
[A]lthough the patient's expected future behavior, and the harm likely to result from that behavior, are matters for expert psychiatric opinion, whether the harm is of sufficient magnitude to warrant commitment, and whether the *likelihood* of that harm is sufficient to warrant commitment, are again matters of law.
140 U.S.App.D.C. at 239 n. 46, 434 F.2d at 513 n. 46 (emphasis in original).

43. [T]he opinion of a qualified psychologist [or psychiatrist] is competent and admissible,

*Jenkins v. United States,* 113 U.S.App.D.C. 300, 307 F.2d 637 (1962) *(en banc).* This does not mean that the trier of facts is bound by such opinion. As we stated in *Jenkins,* "The weight to be given any expert opinion admitted in evidence by the judge is exclusively for the jury." 113 U.S.App.D.C. at 309, 307 F.2d at 646. Here the judge was the trier of facts and the same rule applied.
140 U.S.App.D.C. at 230, 434 F.2d at 504.

44. *United States v. Ecker,* 156 U.S.App.D.C. at 225, 479 F.2d at 1208.

45. *Id.*

46. Transcript at 22–24, 98–100 (Dr. Saiger); 157–58 (Dr. Taub); 188–90 (Dr. Donohue); 196–97 (Dr. Shapiro).

47. Transcript at 22–24, 98–100, 157–58, 196–97.

by a retreat into vagueness and intellectual verbiage. One response on the Rorschach is perhaps indicative of Mr. Ecker's self-percept: "—fragile and velvety, not yet solid or anchored." [48]

Dr. Shapiro's report is not by any means the only portion of the record justifying the district court's decision. The record is replete with other ambiguities and uncertainties which would give pause to any court considering this patient's release. Even Dr. Saiger, appellant's most outspoken advocate, admitted that the possibility would always remain, though he thought it to be unlikely, that under stressful circumstances Ecker would again react in a violent fashion.[49] The factors upon which the district court relied are set forth in the findings of fact and conclusions of law quoted above.

Of considerable importance to the district judge's decision is the undeniable fact that this patient has been thought by the medical experts to be ready for a return to community life before, and that the experts have been proved tragically wrong. The record in this case reveals that appellant's mental illness has been developing and evolving since his early childhood. Previously psychiatric records have indicated that appellant was ready and able to function in society. Yet little more than two years after one such determination and his resulting release from Shepard-Pratt Hospital, appellant committed the rape and murder which led to his current institutionaliza-

tion. Without recounting every item of evidence supporting Judge Smith's determinations in this case, we conclude that his findings of fact and conclusions of law are amply supported by the record and are not clearly erroneous.

## IV. BURDEN OF PROOF

Closely related to the issue of standard of review is the issue of burden of proof at the district court level. Our search of the case law in this jurisdiction has uncovered no cases squarely holding who, if anyone, has the burden of proof in a section 301(e) release proceeding. The only mention of burden of proof in the majority opinion in *Hough* simply recites the district court's conclusions of law.[50] On the other hand, Judge Miller's dissent in *Hough* indicates that mental patients seeking conditional release may face a heavier burden of proof than those seeking unconditional release.[51] Contrary to Judge Miller's suggestion, we find it logical that patients seeking conditional release bear the same burden as patients seeking unconditional release. In the conditional release situation the proposed conditions are theoretically designed to take care of whatever personal inadequacies still handicap the patient and to protect the public. The test in either conditional or unconditional release cases is the same, *i. e.,* whether release will benefit the patient *and* be safe for the public. However, in *patient-initiated* release proceedings (*e. g.,* habeas corpus proceedings) the burden of proof

48. App. at 63.

49. Transcript at 119.

50. Judge Bazelon tells us,
 The conclusions of law stated that "it has not been shown by a preponderance of the evidence that [appellant] should be released conditionally; that the Government has shown by a preponderance of the evidence that [she] should not . . . ."
 106 U.S.App.D.C. at 195, 271 F.2d at 461 (brackets in original).

51. Judge Miller dissented because he believed that the district court's order denying conditional release was justified and required by the evidence. In support of his position, Judge Miller made the following interesting observation:

 Obviously, conditional release is more difficult to justify than is unconditional release. For with respect to conditional release, the certificate is that the confined person is still insane, but that the superintendent thinks it would be safe to release [the patient] under supervision. It is, of course, much easier to believe that a sane person will not in the reasonable future be dangerous to himself or others than to believe that an insane person will not be. The court should be even more careful in examining the evidence as to the danger involved in conditional release of an insane person, than with respect to the unconditional release of a person who has recovered his sanity.
 106 U.S.App.D.C. at 199, 271 F.2d at 465.

requirements are and should be, by the comparative language in the statute and by our decisions, heavier than those applicable to release proceedings initiated by the patient's hospital under section 301(e)'s certification procedure.[52]

In a footnote in *Bolton* Judge Bazelon reminds us that this court in *Lake v. Cameron* "made clear that '[p]roceedings involving the care and treatment of the mentally ill are not strictly adversary proceedings'. . . . Thus technical rules as to who has the burden of bringing relevant evidence to the attention of the court do not apply."[53] Our court (Judges Bazelon, Leventhal and Robb) reiterates this position in *Dixon,* "The District Court and the parties bear an equal responsibility to see that decision is had upon all the relevant evidence."[54]

We agree with and follow this nonadversary view of the burden of producing evidence[55] in "proceedings involving the care and treatment of the mentally ill." Judge Bazelon's concurrence in *McNeil* also implies a nonadversary view of the burden of going forward into the procedures pre-

**52.** In contrast with the other three methods of establishing eligibility for release under section 301, neither the language of subsection (e) nor the relevant case law places a burden of proof, by the preponderance of the evidence, on the patient who is seeking release. *Compare* 24 D.C.Code §§ 301(d)(2) ("fifty day" hearing); 301(k)(3) (motion for relief); *and* 301(g) (habeas corpus) *as construed in Bolton v. Harris,* 130 U.S.App.D.C. at 12, 395 F.2d at 653. We interpret this singular failure to require the patient to prove his eligibility, by the preponderance of the evidence to reflect the fact that section 301(e) release proposals are initiated by the hospital and not the patient, *i. e.,* to avoid the anomaly of requiring a patient who is not the proponent of the proposed action to bear a heavier burden of proof on the issue of "dangerousness" than the hospital that initiated the recommendation and the government that may or may not oppose it.

We note that section 301(g), like section 301(e), does not expressly assign a burden of proof to any party, but in *Bolton v. Harris* this court held that the traditional rule—that the petitioner must prove, by the preponderance of the evidence, that his detention is illegal—also applies in habeas corpus proceedings under section 301(g). 130 U.S.App.D.C. at 12, 395 F.2d at 653. Judge Leventhal, however has expressed "grave reservations" with respect to the *Bolton's* comments on burden of proof:

What troubles me is that passage of *Bolton* which states that equal protection requirements dictate that the burden of proof in establishing eligibility for release [under section 301(g)] for subsection (d) patients "must be the same as that for civilly committed patients." Insofar as *Bolton* went beyond the procedural aspects of subsection (d) redeterminations and procedures for release, and discussed the standards governing judicial decisions on such applications, its expressions seem to me to be dicta . . . . .

. . . . . 

[T]here is room for confinement without punishment because of danger, as is true not only of the mentally ill, but also of those who will infect others with disease (sometimes, as in the case of Typhoid Marys, though they are not themselves disabled by the disease). And in the case of confinement without punishment, I think there may be room for a difference in the standard that governs the issue of detention or release for the person who has already unhappily manifested the reality of anti-social conduct, perhaps even shifting to him the burden of proof that decides the doubtful case where we can not have confidence in our predictions. In the last analysis the issue is one that inextricably intertwines public morality and public need. *Dixon v. Jacobs,* 138 U.S.App.D.C. at 332, 334, 427 F.2d at 602, 604 (footnote omitted).

**53.** 130 U.S.App.D.C. at 12 n. 64, 395 F.2d at 653 n. 64, *quoting from Lake v. Cameron,* 124 U.S.App.D.C. 264, 268, 364 F.2d 657, 661 (1966) (en banc). *Accord, United States v. Snyder,* 174 U.S.App.D.C. 117, 529 F.2d 871 (1976), where Judge Robb describes the nature of a hospital-initiated, unconditional release proceeding in the district court:

The proceedings before the District Court were "not strictly adversary proceedings." . . . The hearing was before the judge without a jury, a circumstance that normally relaxes the strict rules of proof and allows the judge to evaluate evidence without straining it through a fine technical sieve. 529 F.2d at 877.

**54.** 138 U.S.App.D.C. at 328 n. 29, 427 F.2d at 598 n. 29.

**55.** As is frequently pointed out, the term "burden of proof" encompasses two distinct burdens: the burden of persuasion and the burden of going forward with or producing the evidence. *See* C. McCormick, Handbook of the Law of Evidence § 336 at 783–84 (2d ed. E. Cleary 1972). To avoid confusion we will use the term "burden of proof" only when we are referring collectively to both subsidiary burdens.

scribed for conditional release proceedings. In these proceedings the district court does indeed have "a unique responsibility . . to see that all the relevant evidence is marshalled towards decision . . . ."[56] We, however, go one step further than Judge Bazelon did in *McNeil.* We hold that in a hospital-initiated, conditional release proceeding there is no assignable burden of proof as we would know it in a criminal or civil case.[57] These are truly investigatory proceedings in which traditional notions of proof are simply inapplicable. The district court, the hospital, the patient, and the government share an obligation to elucidate and explore all the relevant facts.[58]

At the hearing below appellant seemed somewhat confused by the order in which Judge Smith chose to receive the evidence.[59] Since this was an investigatory proceeding

**56.** *United States v. McNeil,* 140 U.S.App.D.C. at 235, 434 F.2d at 509 (footnote omitted).

**57.** In his dissent Judge Wright concludes that the district court's standard of review (*see infra* at —————— of 177 U.S.App.D.C., at 182–188 of 543 F.2d) "amounts, unavoidably, to placing the burden of persuasion on the patient (or hospital) seeking release." Dissent at —— of 177 U.S.App.D.C., at 202 of 543 F.2d n. 5. We agree that "in that very limited class of cases where the fact finder [*i. e.,* the district judge], after weighing all the evidence finds himself in a position of equilibrium, not persuaded by either position [*i. e.,* unable to make an affirmative finding that the patient will not in the reasonable future endanger himself or others]," the judge must find against the patient (or hospital) seeking release. *Id.* Generally, this result does not, however, amount to placing the burden of persuasion on the patient or the hospital. For example, as Judge Wright concedes, the district judge "may direct any order of presentation that seems most likely to effectuate [the] goal [of fully developing the facts]," *id.,* which is inconsistent with the customary procedure where there is a formal "preponderance of the evidence" standard. Moreover, this "burden of persuasion" (or statutory standard) at the district court level is the same "burden of persuasion" which section 301(e) requires the hospital superintendent to place upon every patient he certifies for conditional release. Before Saint Elizabeths certified Ecker for conditional release, the hospital also had to make an affirmative finding that Ecker would not in the reasonable future be dangerous to himself or others under the proposed conditions. Rather than read into section 301(e) a preponderance of the evidence standard with all its formalistic trappings (as Judge Lumbard would favor or as Judge Wright interprets this opinion as doing), I favor a nonadversarial inquiry into the facts by the district judge.

**58.** While the facts of the instant case necessarily limit our holding to hearings involving conditional release certifications, we recognize that the nonadversary, investigatory nature of the district court hearing should not change when the hospital initiates an *unconditional* release proposal under section 301(e).

**59.** In his brief appellant asserts, "The court below, over the objections of counsel for Mr. Ecker (Tr. 3–4, 215), ruled that the burden of proof rested on the patient in this conditional release proceeding." Brief for Appellant at 31 n. 17. We find no such ruling by the trial court. At the pages of the transcript referenced in appellant's brief the following exchanges took place, but neither counsel lodged a formal objection nor did the court make anything remotely resembling a ruling:
[Appellant's Counsel:] . . . I would submit that Dr. Saiger is rather a court's witness or both our witness in terms of the fact that he is a government doctor, the treating doctor, and I am sure the Court will be most interested in his views since he is the closest to the patient.

I would submit the latter two witnesses [the two private psychiatrists] that I mentioned are my witnesses, Mr. Ecker's witness.

If the Court would wish us to go forward in this matter, although it has been requested by the hospital, but if Your Honor would like us to begin, we will do that.

If you wish the hospital to go forward through the government, that is fine also.

[Government Counsel:] I am rather perplexed by that position, Your Honor.

It is the defendant's counsel, for the defendant, that is asking for relief.

It is their burden to show that the circumstances are such that he should be released.

I have no objection to counsel calling Dr. Saiger, Dr. Taub and Dr. Donohue and at the appropriate time the government may call Dr. Shapiro who is also in the courtroom.

I think the orderly procedure would be for him to call his witnesses and for us to call our witnesses.

THE COURT: Yes. You may proceed.

[Appellant's Counsel:] I would just make one observation and that this [*sic*] hearing has been requested by the hospital and not by my client.

. . . . .

[Appellant's Counsel:] I would submit that we have met every burden that we must meet in a case such as this.

I would also submit that this is a burden that is somewhat different than if Mr. Ecker would have proposed the conditions to the Court.

This was proposed by the hospital and, therefore, I think the burdens are shifted

where all the parties shared approximately equal burdens of proof, the order of going forward was left to the sound discretion of the trial court. In its discretion the district court must choose the order of presentation that seems most likely to marshal and elucidate all the relevant facts. By any standard, the order of presentation followed at the hearing below seems logical and can not be characterized as an abuse of the trial court's discretion. Since the hospital was the proponent of the conditional release proposal, the hospital through the testimony of Dr. Saiger was asked to go forward with the evidence supporting its recommendation. Appellant then was allowed to supplement the hospital's evidence with the oral and written testimony of two private psychiatrists. Next, the government was asked to present evidence and explain to the court why it opposed the hospital's certification. Finally, before Judge Smith took the matter under advisement, Ecker's counsel and the government's counsel were permitted to summarize their arguments. Throughout the hearing, Judge Smith quite properly did not assign to any party the burden of proving Ecker's eligibility (or ineligibility) for conditional release by the preponderance of the evidence. We find no error in the order of presentation or the standard of proof utilized by the district court.

## V. EQUAL PROTECTION

Under section 301(e) all hospital proposals for the conditional release of persons committed to Saint Elizabeths Hospital following acquittal of criminal charges by reason of insanity (hereinafter "acquitees") must receive district court approval. The court "in its discretion may, or upon objection by the United States or the District of Columbia shall, after due notice, hold a hearing at which evidence as to the mental condition of the person so confined may be submitted." If the district court concludes that under the proposed conditions (or under any other conditions which the court may choose to impose) the patient "will not in the reasonable future be dangerous to himself or others," then "the court shall order his release under such conditions." [60]

In contrast, patients civilly committed to Saint Elizabeths pursuant to 21 D.C.Code §§ 541–45 may be released solely upon a determination by the superintendent of the hospital that "the conditions which justified the involuntary hospitalization of the patient no longer exist," i. e., a determination that the patient is no longer "likely to injure himself or other persons." [61] No judicial review is authorized or required under any circumstances.

Relying on *Baxstrom v. Herold* [62] and *Jackson v. Indiana* [63] appellant argues that the release provisions of section 301(e) deny him equal protection of the laws because

somewhat towards the government, although not totally towards the government, but certainly if the government is to support their position that this man is not ready, they must at least bring on an expert in here to contradict what all four experts said in this case, that is, that this man has sufficient controls and that he is safe to go on this limited release.

. . . . .

THE COURT: It is a very difficult situation. I think you both succeeded in preparing a full record either way the matter is decided.

I, of course, want to do what is in the best interest of Mr. Ecker and his family. On the other hand, I must consider the public inter-

est and the protection and safety of the community.

I am going to take the matter under advisement and consider it further and I will advise you at a later date.

**60.** 24 D.C.Code § 301(e) (1973), as construed in *Hough v. United States,* 106 U.S.App.D.C. at 195, 271 F.2d at 461.

**61.** 21 D.C.Code §§ 545(b), 548 (1973).

**62.** 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966).

**63.** 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).

they differ from the release provisions applicable to involuntarily-committed civil patients (hereinafter "commitees") in two respects, one procedural and one substantive. First procedurally, before an *acquitee* can be released the district court in which he was tried must approve the hospital's certification that he is ready for conditional or unconditional release; a *commitee* may be released on the authority of "[t]he chief of service of a public or private hospital." [64] Second substantively, in order to approve release the district court must find that under the terms of the release of an *acquitee* will not endanger himself or others in the reasonably foreseeable future; [65] the chief of service of the hospital (*i. e.,* the superintendent) need only find that a *commitee* is not "likely to injure himself or other persons." [66]

Since 1958 this court has consistently accepted the proposition that the dangerousness demonstrated by the commission of a crime and acquittal by reason of insanity constitutes a rational basis for the disparity in release provisions governing acquitees and commitees.[67] In *Bolton v. Harris* this court focused on the procedural issue raised here by appellant and expressly upheld section 301(e)'s release procedure for acquitees.[68] In order to comply with *Baxstrom v. Herold* the *Bolton* court also modi-

fied section 301's commitment procedures, holding that procedures substantially similar to those used for other civil commitments must be provided for commitments after acquittal by reason of insanity. In *Baxstrom* a prisoner whose sentence had almost expired was committed to a state mental institution according to statutory procedures different than those applied to other persons civilly committed. The Supreme Court held the statutes in question violative of equal protection since they allowed the prisoner to be committed beyond the duration of his penal sentence without affording him the judicial review generally available to civil committees.

It is not altogether clear how far this court or the Supreme Court has been willing to extend the equal protection rationale of *Baxstrom*. For example, Judge Leventhal, concurring separately in *Dixon v. Jacobs,* hesitated to extend *Baxstrom* beyond its peculiar fact situation. Quoting from Justice Harlan's opinion in *Lynch v. Overholser* he declared,

> Congress might have thought, however, that having successfully claimed insanity to avoid punishment, the accused should then bear the burden of proving that he is no longer subject to the same mental abnormality which produced his criminal acts. Alterna-

---

**64.** *Compare* 24 D.C.Code § 301(e) (1973) *with* 21 D.C.Code § 548 (1973).

**65.** 24 D.C.Code § 301(e), *as construed in Hough v. United States,* 106 U.S.App.D.C. at 195, 271 F.2d at 461. *See generally* section II of this opinion *supra.*

**66.** 21 D.C.Code §§ 545(b), 548 (1973).

**67.** In *Overholser v. Leach,* this court explained that section 301(e)
> applies to an exceptional class of people—people who have committed acts forbidden by law, who have obtained verdicts of "not guilty by reason of insanity," and who have been committed to a mental institution pursuant to the Code. People in that category are treated by Congress in a different fashion from persons who have somewhat similar mental conditions, but who have not committed offenses or obtained verdicts of not guilty by reason of insanity at criminal trials.

103 U.S.App.D.C. 289, 291–92, 257 F.2d 667, 669–70 (1958), *cert. denied,* 359 U.S. 1013, 79 S.Ct. 1152, 3 L.Ed.2d 1038 (1959) (footnote omitted); *accord, Ragsdale v. Overholser,* 108 U.S.App.D.C. 308, 311, 281 F.2d 943, 946 (1960); *Overholser v. O'Beirne,* 112 U.S.App. D.C. 267, 270, 302 F.2d 852, 855 (1961).

**68.** Chief Judge Bazelon, speaking for the court, stated:
> We uphold the release provisions of § 24–301(e) even though they differ from civil commitment procedures by authorizing court review of the hospital's decision to release a patient. We do not think equal protection is offended by allowing the Government or the court the opportunity to insure that the standards for the release of civilly committed patients are faithfully applied to Subsection (d) patients.

130 U.S.App.D.C. at 11, 395 F.2d at 652 (footnote omitted).

tively, Congress might have considered it appropriate to provide compulsory commitment for those who successfully invoke an insanity defense in order to discourage false pleas of insanity. We need go no further here than to say that such differentiating considerations are pertinent to ascertaining the intended reach of this statutory provision.

I see no reason to conclude that these words penned by Justice Harlan in 1963 were scrapped in 1966 by *Baxstrom v. Herold* in which he joined. What *Baxstrom* focused on were (a) procedures for civil commitment (need for jury determination) which were (b) extended on equal protection grounds to one whose prison term was about to expire (in fact did expire prior to the habeas proceeding), and who would thereafter be held on a new commitment.[69]

Additionally, *Jackson v. Indiana* does not clearly define what limits, if any, the Supreme Court intends to place on *Baxstrom*. In *Jackson*, the defendant, a mentally defective deaf mute, was declared incompetent to stand trial on a charge of robbery and committed to the state department of mental health until he became "sane." Contending that his commitment was tantamount to a life sentence without having been convicted of a crime, Jackson claimed that the Indiana commitment statute deprived him of equal protection. He argued that absent the criminal charges against him, the state would have had to proceed under other civil commitment statutes which would have entitled him to substantially greater rights. Justice Blackmun, writing for a unanimous Court,[70] agreed with defendant's contention:

[We] hold that by subjecting Jackson to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release afforded by [other civil commitment statutes], Indiana deprived petitioner of equal protection of the laws under the Fourteenth Amendment.[71]

Thus, the equal protection issue presented in this case comes sharply into focus: whether appellant's commission of criminal acts and the dangerousness to society demonstrated by such acts justify treating appellant differently from a civil commitee for purposes of release.

Previously, this court has concluded that the dangerousness demonstrated by prior criminal conduct does provide a rational basis for some disparities in the statutory provisions governing commitment and release.[72] The crucial distinction between *Jackson* and the present case is that Jackson, although he had a robbery charge pending against him, was not tried and found not guilty by reason of insanity.

Plainly the acquittal by reason of insanity reflects a jury determination, beyond a reasonable doubt, that except for the defense of insanity, defendant did do the act, e. g., kill the deceased, and have the intent that constitutes the substantive crime without any exculpation or mitigation in non-insanity defenses (e. g., self-defense). *Lynch v. Overholser*, 369 U.S. 705, 714, 82 S.Ct. 1063, [1069], 8 L.Ed.2d 211, [217] . . . (1962). If a jury is not ready to make that determination it

---

**69.** 138 U.S.App.D.C. at 333, 427 F.2d at 603 (footnote omitted), *quoting from Lynch v. Overholser*, 369 U.S. 705, 715, 82 S.Ct. 1063, 1069, 8 L.Ed.2d 211, 218 (1962).

**70.** Justices Powell and Rehnquist took no part in the consideration or decision.

**71.** 406 U.S. at 730, 92 S.Ct. at 1854, 32 L.Ed.2d at 446 (footnote omitted).

**72.** *See, e. g., Bolton v. Harris*, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968); *United States v. Brown*, 155 U.S.App.D.C. 402, 478 F.2d 606 (1973); *Dixon v. Jacobs*, 138 U.S.App.D.C. 319, 331–35; 427 F.2d 589, 601–05 (1970) (Leventhal, J., concurring).

must acquit completely, without going on to consider the insanity defense.[73]

Thus, appellant's uncontroverted commission of a violent crime clearly sets the instant case apart from *Jackson*. Moreover, there is no indication in *Jackson* that the defendant's commitment was an exercise of Indiana's police power or necessary to protect the community.

Appellant argues that this distinction between the degree of dangerousness demonstrated by pending and adjudicated charges is no longer sufficient to justify the slightly stricter release standard and the additional procedural hurdle found in section 301(e).[74] Since *Baxstrom* holds that even proven criminal conduct does not justify different standards and procedures at the commitment stage, and since *Jackson* applies *Baxstrom's* rationale to release standards as well as commitment standards, appellant concludes that his prior criminal conduct can not constitute a rational basis for the disparate standards and procedures found in the D.C.Code.

Although superficially sound, there are several flaws in appellant's logic. First,

appellant fails to recognize that both Chief Justice Warren in *Baxstrom* and Justice Blackmun in *Jackson* tempered their holdings with words of caution. "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made,"[75] *i. e.*, a "reasonable justification."[76] Subsection (d) patients are treated differently from civil committees because they are "an exceptional class of people"[77] who have "already unhappily manifested the reality of anti-social conduct."[78] Congress has determined that these individuals pose a significant risk to the community and that the public is entitled to the additional protection afforded by judicial supervision. In order to insure that society's interests are properly weighed when a release proposal is considered, section 301(e) requires the district court to make its own independent determination whether the patient will endanger himself or others in the reasonable future. Clearly, the D.C.Code's substantive and procedural distinctions between acquitees and committees have a

---

**73.** *Dixon v. Jacobs,* 138 U.S.App.D.C. at 331, 427 F.2d at 601 (Leventhal, J., concurring).

**74.** There is language in *Jackson* which can be read to support appellant's position. After discussing the factual context in which *Baxstrom* arose, Justice Blackmun wrote for the Court:

If criminal conviction and imposition of sentence are insufficient to justify less procedural and substantive protection against indefinite commitment than that generally available to all others, the mere filing of criminal charges surely cannot suffice. . . The *Baxstrom* principle also has been extended to commitment following an insanity acquittal, *Bolton v. Harris,* 130 U.S.App.D.C. 1, 395 F.2d 642 (1968); *Cameron v. Mullen,* 128 U.S.App.D.C. 235, 387 F.2d 193 (1967); *People v. Lally,* 19 N.Y.2d 27, 277 N.Y.S.2d 654, 224 N.E.2d 87 (1966), and to commitment in lieu of sentence following conviction as a sex offender. *Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972).

We . . . turn to the question whether, because of the pendency of the criminal charges that triggered the State's invocation of § 9–1706a, Jackson was deprived of substantial rights to which he would have been entitled under either of the other two state commitment statutes. *Baxstrom* held that

the State cannot withhold from a few the procedural protections or the substantive requirements for commitment that are available to all others.

. . . . .

*Baxstrom* did not deal with the standard for release, but its rationale is applicable here. The harm to the individual is just as great if the State, without reasonable justification, can apply standards making his commitment a permanent one when standards generally applicable to all others afford him a substantial opportunity for early release. 406 U.S. at 724–25, 727, 729, 92 S.Ct. at 1851, 32 L.Ed.2d at 443 (footnote omitted). Notice that Justice Blackmun cites *Bolton* approvingly.

**75.** *Baxstrom v. Herold,* 383 U.S. at 111, 86 S.Ct. at 762, 15 L.Ed.2d at 623.

**76.** *Jackson v. Indiana,* 406 U.S. at 729, 92 S.Ct. at 1853, 32 L.Ed.2d at 445.

**77.** *Overholser v. Leach,* 103 U.S.App.D.C. at 291, 257 F.2d at 669.

**78.** *Dixon v. Jacobs,* 138 U.S.App.D.C. at 334, 427 F.2d at 604 (Leventhal, J., concurring).

great deal of "relevance to the purpose for which the classification[s] [were] made." [79]

Second, appellant attempts to equate "standards" with "procedures." In *Jackson* the Court found a denial of equal protection in the fact that the release *standards* applicable to Jackson differed from those generally applicable to civil committees. Since *Jackson* did not involve differences in procedure it can hardly be dispositive of the procedural question facing this court: whether the additional requirement of district court approval denies equal protection to patients such as Ecker. [80] While we realize that substantive rights can be rendered nugatory if procedural rights are ignored, we do not understand how independent judicial review deprives a patient of any substantive right. Moreover, that review is designed for the protection of the public against whom the acquitee has already been shown to have committed one or more crim-

inal acts, thus differentiating himself from the civil commitee.

Finally, and most importantly, appellant asks this court to overrule its decision in *Bolton* and extend the *Baxstrom-Jackson* equal protection doctrine to a situation where it has never yet been applied by a federal court. *Baxstrom* involved commitment procedures at the end of a prisoner's sentence term, and in *Humphrey v. Cady* [81] the Supreme Court clearly indicated that *Baxstrom* fully applies to acquitees who have been confined for a period equal to the maximum sentence authorized for their crimes. [82] So far, however, no federal cases have held that during their maximum sentence period acquitees are entitled to the same release standards and procedures provided for civil commitees. [83] This is the extension of the *Baxstrom-Jackson* equal protection doctrine which appellant urges this court to adopt. We choose instead to

**79.** *Baxstrom v. Herold,* 383 U.S. at 111, 86 S.Ct. at 762, 15 L.Ed.2d at 623.

**80.** Of course, for the reasons already set forth in this opinion *Jackson* also is not dispositive of the substantive question before this court. For equal protection purposes the pending robbery charge against Jackson cannot be equated with the brutal rape and murder undeniably committed by appellant. Furthermore, even if Jackson's alleged robbery could be equated with Ecker's proven rape and murder there is no constitutional infirmity where the standards applicable to acquitees and commitees are "substantially similar." *See Bolton v. Harris,* 130 U.S.App.D.C. at 10, 395 F.2d at 651. Obviously, a finding by a district court that it is more probable than not (*i. e.,* 50 + % likely) that a patient will not be violently dangerous in the future (the standard we adopt in section II of this opinion) is substantially similar to a finding that a patient is not likely (*i. e.,* not 50 + % likely) to injure himself or others (the statutory standard governing the release of civil commitees and the standard described by Judge Bazelon in *Bolton* and *Dixon*). Between these two standards, the only difference in result occurs when the two likelihoods are equally balanced, *i. e.,* when dangerousness is just as likely as it is unlikely. *See generally* notes 30–37 *supra* and accompanying text.

**81.** 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972).

**82.** For an indepth analysis of *Humphrey, Jackson,* and *Baxstrom,* see Judge McGowan's opin-

ion in *Waite v. Jacobs,* 154 U.S.App.D.C. 281, 475 F.2d 392 (1973).

**83.** In three state cases and in one federal case which has been vacated by the Supreme Court, *Jackson* and *Baxstrom* have, in our opinion, been read too broadly. *See People v. McQuillen,* 392 Mich. 511, 221 N.W.2d 569 (1974); *State v. Clemons,* 110 Ariz. 79, 515 F.2d 324 (1973); *Wilson v. State,* 259 Ind. 375, 287 N.E.2d 875 (1972); *Reynolds v. Neill,* 381 F.Supp. 1374 (N.D.Tex.1974), *vacated sub nom. Sheldon v. Reynolds* and *Reynolds v. Sheldon,* 422 U.S. 1050, 95 S.Ct. 2671, 45 L.Ed.2d 703 (1975). None of these cases, however, specifically addresses the maximum sentence period issue so clearly discussed by Judge McGowan in *Waite v. Jacobs,* 154 U.S.App.D.C. at 286–89, 475 F.2d at 397–400, and all three state cases refer approvingly to this court's decision in *Bolton v. Harris.*

Also, it is interesting to note that the *McQuillen* court did not pass upon the question "whether a criminally committed defendant's equal protection rights are violated by requiring that he be 'evaluated and recommended for release by the center for forensic psychiatry' prior to final discharge when a civilly committed person need not be scrutinized by the forensic center prior to final discharge." 392 Mich. at 543 n. 9, 221 N.W.2d at 584 n. 9. In any event, to the extent that these cases are inconsistent with our decision we believe that they are wrongly decided.

adhere to Judge McGowan's 1973 interpretation of *Baxstrom, Jackson,* and *Humphrey:*

 . . . *Jackson* expressly holds that *Baxstrom* is applicable to the problem of release from indefinite confinement . . . . Read together, then *Humphrey* and *Jackson* indicate that, once the maximum sentence period has expired, it is unconstitutional to discriminate against an acquitee, as compared with a committee, for purposes of release from indefinite commitment. From that moment on, acquitees and commitees appear, in the Court's contemplation, to be on the same footing.[84]

Similarly, in *Humphrey,* Justice Marshall recognizes the limited scope of *Baxstrom's* applicability when he concedes that a criminal conviction may justify some differences in procedural safeguards if the differences are "limited by the nature of the defendant's crime or the maximum sentence authorized for that crime."[85]

Ecker has been institutionalized for over seven years, but absent his acquittal by reason of insanity he could have been incarcerated for life. We believe that prior criminal conduct, especially violent conduct such as that involved in this case, provides a "reasonable justification"[86] (*i. e.,* a rational basis) for the differences in release procedures found in the D.C.Code.

## VI. RIGHT TO TREATMENT

We unhesitatingly agree with appellant's contention that he has a right to treatment under the least restrictive conditions possible.[87] We disagree, however, with his assertion that this right to treatment entitles him to the unsupervised access to the community that would be permitted under the hospital's conditional release plan. Dr. Saiger and the hospital suggest that a step-by-step reentry into the community is essential to Ecker's continued improvement. Be this as it may, since Judge Bazelon's decision in *Hough,* it has been settled that section 301(e) precludes Saint Elizabeths from prescribing community access for its patients unless such access receives district court approval.[88] When a

---

**84.** *Waite v. Jacobs,* 154 U.S.App.D.C. at 288, 475 F.2d at 399.

**85.** Writing for a unanimous Court, Justice Marshall explained:

Respondent seeks to justify the discrimination on the ground that commitment under the Sex Crimes Act is triggered by a criminal conviction; that such commitment is merely an alternative to penal sentencing; and consequently that it does not require the same procedural safeguards afforded in a civil commitment proceeding. That argument arguably has force with respect to an initial commitment under the Sex Crimes Act, which is imposed in lieu of sentence, and is limited in duration to the maximum permissible sentence. The argument can carry little weight, however, with respect to the subsequent renewal proceedings, which result in five-year commitment orders based on new findings of fact, and are in no way limited by the nature of the defendant's crime or the maximum sentence authorized for that crime. The renewal orders bear substantial resemblance to the post-sentence commitment that was at issue in *Baxstrom.*

405 U.S. at 510–11, 92 S.Ct. at 1052, 31 L.Ed.2d at 403 (footnote omitted).

**86.** *Jackson v. Indiana,* 406 U.S. at 729, 92 S.Ct. at 1853, 32 L.Ed.2d at 445.

**87.** As Chief Judge Bazelon and Judge Robinson stated in a per curiam opinion:

It is clear that one who by reason of insanity is acquitted of crime and who upon a *Bolton* hearing is committed to a mental hospital is entitled not only to treatment but to treatment in "the least restrictive alternative consistent with the legitimate purposes of a commitment."

*Ashe v. Robinson,* 146 U.S.App.D.C. 220, 222, 450 F.2d 681, 683 (1971) (footnotes omitted), *quoting from Covington v. Harris,* 136 U.S.App.D.C. at 41, 419 F.2d at 623; *accord, Tribby v. Cameron,* 126 U.S.App.D.C. at 328, 379 F.2d at 105; *Rouse v. Cameron,* 125 U.S.App.D.C. 366, 369, 371, 373 F.2d 451, 454, 456 (1966). *See also* 21 D.C.Code § 562 (1973).

**88.** In *Hough* Judge Bazelon construed the term "conditional release," as used in section 301(e), to include all temporary leaves into the community:

We read "conditional release" as used in the present statute to include the kind of temporary freedom which has been given this appellant. We do not, of course, lose sight of the hospital's view that such temporary freedom is often an essential part of the therapeutic process and, therefore, must not be prevented. But calling it a conditional release does not prevent it. It simply requires

patient who has committed violent criminal acts is released from the hospital, either conditionally or unconditionally, the safety interests of the community must be considered. Congress saw fit to protect these interests through the judicial review procedure of section 301(e), and in the instant case Judge Smith pursuant to that procedure determined that the potential for harm outweighed appellant's right to this particular mode of treatment. We find no error in Judge Smith's application of the well-settled precedents of this court—there is no right to treatment at the community's peril.

## VII. CONCLUSION

It is not within our province to weigh the evidence in this case and make a *third* independent determination on the question of dangerousness—the first two determinations being those of the hospital and the district court. Therefore, since the record before us reflects no errors in law, no findings of fact which are clearly erroneous or not supported by the record, and no abuses of discretion, we affirm the order of the district court denying the hospital's recommendation for conditional release.[89]

Affirmed.

LUMBARD, Circuit Judge (concurring):

Following a non-jury trial before Judge John Lewis Smith, Jr., upon stipulated facts in May 1968, Lewis Ecker was acquitted by reason of insanity of the rape and murder of a senatorial aide. Ever since, he has been confined to Saint Elizabeth's Hospital. The superintendent of that institution has now recommended, for the second time, that Ecker be conditionally released for a few hours each day to participate in a vocational training program. On December 27, 1974, Judge Smith rejected that petition, a decision which the majority today upholds. I concur.

the hospital authorities, when they decide that a patient has reached the stage where such freedom is necessary and proper to certify that fact to the District Court and obtain an appropriate order, reviewable by this Court.
106 U.S.App.D.C. at 196, 271 F.2d at 462.

The plain language of § 301(e) requires the district court to focus on the question of whether the patient whose release is proposed "will . . . in the reasonable future be dangerous to himself or others." There can be no doubt that Judge Smith was well justified in concluding that Ecker's release posed an unacceptable risk to the safety of the community. It is undisputed that, at the time of the instant petition, appellant continued to suffer from "chronic mental illness, namely anti-social personality disorder (with organic features), . . . and sexual deviation (sadism)" as well as experiencing an active fantasy life. Ecker seeks to minimize the severity of his condition by stressing that each of the experts who testified below advocated his conditional release. While deference is of course due the opinions of trained psychiatrists and psychologists, it is and must remain the responsibility of the court to weigh the patient's individual therapeutic needs against the possibility of danger to society at large. See *Dixon v. Jacobs,* 138 U.S.App.D.C. 319, 322, 427 F.2d 589, 595 at n. 17 (1970). Judge Smith properly balanced those considerations in this case.

Indeed, the propriety of the district court's ruling is so apparent from the record that I do not believe it is necessary to reach out and decide the novel question of where the burden of proof should lie in § 301(e) hearings. No matter on whom the burden is placed, Judge Smith's decision that the confinement of Lewis Ecker be continued is supported by the evidence. Judge Wilkey nevertheless holds that in such proceedings, "there is no assignable burden of proof as we would know it in a criminal or civil case."

I am constrained to disagree. The unfortunate but inescapable fact is that Ecker's mental illness has already manifested itself in the commission of a violent and anti-so-

89. Of course, our judgment is without prejudice to future hospital recommendations or future requests for release by this patient.

cial act. Under these circumstances, I would require the Hospital to show by a preponderance of the evidence that his release under the conditions herein proposed would not in the reasonable future endanger the lives and well-being of those with whom Ecker may come into contact. Such an allocation would be consistent with the standard employed in evaluating patient initiated habeas corpus petitions under § 301(g). See *Bolton v. Harris,* 395 F.2d 642, 653 (D.C.Cir.1968).

Ecker's past conduct similarly justifies the requirement that those committed after a finding of not guilty by reason of insanity obtain judicial approval prior to their conditional or unconditional release although no such additional procedural hurdle is placed in the path of those civilly committed. An equivalent equal protection attack upon this disparity was dismissed by this Circuit in *Bolton v. Harris, supra* at 652. Nothing has transpired in the intervening years which would require us now to reconsider that decision. I am in complete accord with Judge Wilkey's conclusion that *Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966) and *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), do not control the instant situation.

I would affirm the order of the district court denying appellant's request for conditional release.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

In 1967 Lewis Ecker, suffering from mental illness, brutally raped and murdered a young woman. He was tried and found not guilty by reason of insanity. After a *Bolton* hearing[1] he was committed to St. Elizabeth's Hospital. Although his illness was serious and his condition chronic, he has improved significantly during the course of his years at the hospital. Tr. 22,

123, 137–138, 150, 172, 197–198. This is reflected both in IQ tests (his IQ rose 15–25 points by 1972) and in other psychological tests administered most recently in June 1974. They show continued inner turmoil and fantasies, but they demonstrate an improved ability to deal with problems. These tests also indicate that Ecker now regards his fantasies as "quite ego-alien," Tr. 23–27, App. 61, that he can step aside and deal with them at a distance, Tr. 203, avoiding the necessity of "acting out," App. 63, and that he now has a better sense of the "time spectrum," appreciating "that there is not immediate relief to any sense of tension." Tr. 113; *see also* Tr. 83–84. And since 1972 he has been virtually without medication. Tr. 13; *contrast United States v. Ecker (Ecker I),* 156 U.S.App.D.C. 223, 225, 227, 479 F.2d 1206, 1208, 1210 (1973).

Ecker has, as well, taken an active volunteer role in the life of the hospital community, showing movies to elderly patients and participating in editing and publishing a hospital newsletter. Tr. 10, 17–18, 97. He has had grounds privileges (unsupervised access to the hospital grounds) since 1971. Tr. 11, 173. Perhaps most important, he has participated in vocational therapy, first with the Behavioral Studies Division and then in the Sheltered Workshop at the hospital. Tr. 14–17. He has shown interest in and aptitude for electronics work, and he has been given some supervisory responsibilities at the Sheltered Workshop. Tr. 15–17. He has, in fact, advanced through substantially all of the training opportunities open to him at the hospital; the logical next step of his treatment is electronics training at a vocational training institution outside the hospital grounds. Tr. 56.

In order to permit him to take this next step the hospital, after review, certified Ecker for conditional release under 24 D.C. Code § 301(e) (1973),[2] thereby indicating

---

1. *Bolton v. Harris,* 130 U.S.App.D.C. 1, 395 F.2d 642 (1968).

2. Section 301(e) is set forth in its entirety in footnote 12 of Judge Wilkey's opinion. The statute makes it clear that the patient may be released on the strength of the hospital's certif-

icate alone unless the Government or the court *sua sponte* moves for a hearing. In that event the court weighs the evidence and decides for itself whether the statutory requisites are met. This provision for court review of hospital decisions to grant release applies only to those committed under § 301(d)—that is, those ac-

that, in the hospital's judgment, Ecker would not be "dangerous to himself or others" under the proposed conditions. He was to be released from the hospital only for sufficient time to travel to and from the school and attend classes; he would always spend the night and evening at the hospital. If his progress was satisfactory he could have further time for library and lab work. Finally he might gain permission to spend certain weekends or holidays with his family. All these measures were seen as the logical next steps in his treatment.

The Government does not challenge the hospital's right to seek conditional release for purposes of treatment. Indeed it could not; treatment must be regarded as the most compelling reason for conditional release of a patient not completely recovered. *See generally Ashe v. Robinson,* 146 U.S. App.D.C. 220, 222, 450 F.2d 681, 683 (1971); *Covington v. Harris,* 136 U.S.App.D.C. 35, 43, 419 F.2d 617, 625 (1969); *Tribby v. Cameron,* 126 U.S.App.D.C. 327, 328, 379 F.2d 104, 105 (1967); *Rouse v. Cameron,* 125 U.S. App.D.C. 366, 373 F.2d 451 (1966); *Hough v. United States,* 106 U.S.App.D.C. 192, 196, 271 F.2d 458, 462 (1959) ("temporary free-

dom is often an essential part of the therapeutic process"); 21 D.C.Code § 562 (1973). The Government does assert, though, that Mr. Ecker's situation does not meet the "dangerousness" standard for conditional release under Section 301(e). And it asserts at the threshold that, contrary to Ecker's argument, the Government does not bear the burden of proof on the dangerousness issue when it opposes release, despite the hospital's certification.[3]

I

On the burden of proof question the statute is hardly a model of clarity.[4] I agree with Judge Lumbard that on this record we need not decide this dispute. We should, moreover, be especially cautious in finally deciding the question in view of the difficulty of the issue. Judge Wilkey, for example, says in Part IV of his opinion that in conditional release proceedings "there is no assignable burden of proof as we would know it in a criminal or civil case." Yet in Part II of his opinion he seems clearly to place the burden of *persuasion* on the patient or perhaps the hospital.[5] Judge Lum-

quitted of an offense by reason of insanity. Patients civilly committed may be released when the hospital itself determines that the statutory requisites are met, without court review. *See, e. g.,* 21 D.C.Code § 548 (1973).

**3.** Note that the certificate is sufficient of itself to authorize release of the patient. *See* note 2 *supra.*

**4.** The statute provides four methods by which the insanity-acquitted may gain release. Under two of them it expressly places the burden of proof on the patient. 24 D.C.Code §§ 301(d)(2) & (k)(3). Section 301(g) preserves the patient's right to petition for *habeas corpus.* It gives no indication of the burden of proof in such a proceeding, but this court has construed the provision to place the burden on the patient, principally because of the usual allocation of the burden in *habeas corpus* cases. *Bolton v. Harris, supra* note 1, 130 U.S.App.D.C. at 12, 395 F.2d at 653. Section 301(e) is likewise silent on burden of proof, but here there is no centuries-old tradition compelling the conclusion that the burden is on the patient—or on the hospital, which is really the moving party.

**5.** Judge Wilkey writes, quoting from Judge Leventhal's concurrence in *Dixon v. Jacobs,*

138 U.S.App.D.C. 319, 332, 427 F.2d 589, 602 (1970), that continued confinement is appropriate "unless the district court can make an 'affirmative finding that it is at least more probable than not that [the patient] will not be violently dangerous in the future.'" Wilkey op. at 18. A preponderance standard for the burden of persuasion is meant to operate only in that very limited class of cases where the fact finder, after weighing all the evidence, finds himself in a position of equilibrium, not persuaded by either position. In such an instance, he is to find against the party bearing the burden of proof. The quoted passage from Judge Wilkey's opinion therefore amounts, unavoidably, to placing the burden of persuasion on the patient (or hospital) seeking release.

The discussion in Part II of Judge Wilkey's opinion is clouded by the reference to "a substantial problem of danger in the reasonable future"—a phrase never defined. Wilkey op. at 18. Whatever this may mean, it can neither add to nor detract from the statutory test, as authoritatively construed in *Hough v. United States,* 106 U.S.App.D.C. 192, 195, 271 F.2d 458, 461 (1959): determining by a preponderance standard whether the patient will or "will not in the reasonable future be dangerous to himself or others" under the proposed condi-

bard, although agreeing that the question need not be reached, offers his view that the burden is on the *hospital.* But this puts the United States Attorney's office in the anomalous position (unless the patient hires counsel to represent the hospital-patient position) of potentially being called upon to represent both sides—choosing on its own to oppose the release, but being called upon to serve as lawyer for the government hospital.[6] In any event, hospital certification amounts to significant support for the patient in his effort to secure conditional release; it must mean that the hurdles are not as high as if he sought conditional release on his own motion. This is particularly true where, as here, the conditional release is for treatment.

## II

I dissent from the judgment affirming the District Court because that court's opinion does not rest upon findings adequate to support the outcome reached or to provide for meaningful judicial review. *United States v. McNeil,* 140 U.S.App.D.C. 228, 229, 434 F.2d 502, 503 (1970) *(per curiam);*[7] *cf. Millard v. Cameron,* 125 U.S.App.D.C. 383, 386, 373 F.2d 468, 471 (1966), *reversed after remand, sub nom. Millard v. Harris,* 132 U.S.App.D.C. 146, 406 F.2d 964 (1968);

*Whittaker v. Overholser,* 112 U.S.App.D.C. 66, 68, 299 F.2d 447, 449 (1962).

The most glaring deficiency lies in the District Court's failure to indicate what other conditions for release were considered and—obviously—rejected. Both the statute and our cases make clear that if the court is dissatisfied with the conditions suggested by the hospital—if, that is, it feels the danger is too high under those conditions—then it is the court's duty to consider and impose such other conditions as will make conditional release acceptably safe. *United States v. McNeil, supra,* 140 U.S.App.D.C. at 239, 434 F.2d at 513 (Bazelon, C. J., concurring); *Dixon v. Jacobs,* 138 U.S.App. D.C. 319, 325, 427 F.2d 589, 595 (1970); *Hough v. United States, supra,* 106 U.S. App.D.C. at 195, 271 F.2d at 461; *cf. Lake v. Cameron,* 124 U.S.App.D.C. 264, 268, 364 F.2d 657, 661 (1966) *(en banc).* The record indicates the District Court's probably justified displeasure with the laxity of some hospital-proposed conditions. Tr. 210, memorandum op. ¶ 8. But more narrow—and still reasonable—conditions which would remedy at least some of the problems quickly come to mind.[8] Yet the District Court has given us no indication of other conditions considered or of the reasons for reject-

tions or any others which may reasonably be imposed.

I do wish to state my agreement with the major thrust of Part IV of Judge Wilkey's opinion. Conditional release proceedings are "not strictly adversary proceedings." *Lake v. Cameron,* 124 U.S.App.D.C. 264, 268, 364 F.2d 657, 661 (1966) *(en banc).* I take this to mean, at a minimum, that the *burden of going forward* does not fall rigidly upon either side. Rather the judge has an affirmative duty to take an active and vigorous role to see that all the facts are developed to the fullest extent possible at the hearing. He may direct any order of presentation that seems most likely to effectuate that goal.

6. St. Elizabeth's is clearly a government hospital. *See* 24 U.S.C. § 161 *et seq.* (1970 and Supp. IV 1974); 32 D.C.Code § 401 *et seq.* (1973).

7. Judge Wilkey's attempt to distinguish *McNeil,* in footnote 40 of his opinion, strikes me as unconvincing. The brief *per curiam* opinion in that case was not directed only to the vice of denying conditional releases with no

explanation whatever. *See Hough v. United States, supra* note 5, 106 U.S.App.D.C. at 195, 271 F.2d at 461. The same concerns that led to remand there warrant remand where, as here, the District Court's explanation sheds insufficient light on the crucial determinations.

8. The court expressed a concern, for example, that the hospital's proposal "still does not provide adequate controls over Mr. Ecker during the periods he would be away from the hospital." Memorandum op. ¶ 8. This may have reference—we are not further enlightened—to the testimony that the hospital would not learn of any truancy episodes until a week following any absence. Tr. 60. If this is the problem, it would be relatively simple to impose a condition that the school telephone the hospital each morning reporting Mr. Ecker's arrival or absence. Or the court could require that the hospital, at least at first, transport him to and from the school, rather than permitting him to ride unaccompanied on public transportation. *See* Tr. 210.

ing them. The only mention of other possible conditions comes in the concluding paragraph of the memorandum opinion: Mr. Ecker's release would not be safe "under the proposed conditions of release (or any conditions which could reasonably be imposed) * * *." Memorandum op. ¶ 9. This conclusory statement is inadequate. I would remand for reconsideration and for a more careful articulation, on the record, of alternative conditions considered and the reasons for rejecting them.

### III

The District Court's findings are inadequate in another important respect. There is a certain momentum in cases of this sort, it seems to me, pulling strongly toward reading the conditional release provisions out of the statute. The initial episode which sent Ecker to St. Elizabeth's was so brutal that there is a tendency to seek proof of complete recovery and assurance of safety under any conceivable conditions before granting even a limited release. If courts yield to this entirely understandable urge, then patients like Ecker will be entitled either to unconditional release or to no release at all.

Congress cannot have been unaware of these concerns. Yet in Section 301(e) *Congress* has explicitly chosen to permit, in appropriate circumstances, conditional release of patients not completely recovered. And the only patients who come under Section 301(e) are those who were initially hospitalized after committing a criminal act. Courts must take care to honor the congressional judgment. Congress has provided, I emphasize, that a person committed following an insanity acquittal may be entitled to conditional release *without proving that he has recovered completely*, without proving that, *unmonitored*, he would never be dangerous, and certainly without proving that medical authorities have always been 100 percent accurate in past judgments of his condition.[9]

The question for the court in this case is whether "the individual has recovered sufficiently so that under the proposed conditions—or under conditions which the statute empowers the court to impose 'as [it] shall see fit,'—'such person will not in the reasonable future be dangerous to himself or others.'" *Hough v. United States, supra*, 106 U.S.App.D.C. at 195, 271 F.2d at 461 (footnote omitted). And the court is of course concerned not with finding the mere possibility of danger but with assessing its likelihood. *See Dixon v. Jacobs, supra*, 138 U.S.App.D.C. at 325 n.17, 427 F.2d at 595 n.17; *Millard v. Harris*, 132 U.S.App.D.C. 146, 159, 406 F.2d 964, 977 (1968).[10]

**9.** Judge Wilkey suggests obliquely that the expert testimony here—unanimously in favor of conditional release—is entitled to especial skepticism because other experts, years ago, failed to foresee that Ecker's illness might lead to the murder he committed when they released him from Shepard-Pratt Hospital in 1965. Wilkey op. at 25. This strikes me as deeply unfair to Ecker and to the medical profession. It is well settled that the question before the court in a conditional release proceeding is the patient's *present* condition. *Rouse v. Cameron*, 125 U.S.App.D.C. 366, 376 n.43, 373 F.2d 451, 461 n.43 (1966). Past diagnoses may have proven tragically in error, but this does not by any means indicate that current medical opinion is necessarily wrong.

Moreover, the suggestion yields to no limiting principles. There will always be in Ecker's case history the erroneous 1965 diagnosis. Does this mean that he can never secure release, no matter what the psychiatrists and psychologists may say from the stand? Furthermore, there is no inherent reason why the past error should apply only to Ecker. Logically it might as well apply to any hospital recommendation for any patient's conditional release: hospitals have been badly wrong in the past; they might be wrong here. Everyone knows that psychiatric predictions fall well short of perfect accuracy—a fact candidly acknowledged by the experts who testified in this case, *e. g.*, Tr. 56, 119—but no one seriously believes that every hospital recommendation must therefore be rejected.

I would suggest that Judge Wilkey's reliance on this factor does not constitute a part of the holding of this court.

**10.** Assessing the likelihood of danger is, beyond doubt, a peculiarly difficult determination. In *Covington v. Harris*, 136 U.S.App.D.C. 35, 45–46, 419 F.2d 617, 627–628 (1969), the court explored these difficulties with particular eloquence. The issue there was whether the *hospital's* decision to keep the patient in the maximum-security John Howard Pavilion was valid. In the course of its consideration this

The District Court's findings here are inadequate for us to determine whether this was in fact the question it asked and answered. The only truly useful explanation of the court's decision comes in the following passage from Paragraph 9 of the memorandum opinion:

> This conclusion [that conditional release should be denied] is made with particular reference to [Ecker's] mental illness, its chronic nature, the continuing existence of fantasies in his mind and his uncertain ability to deal with them, the continuing turmoil he is experiencing, and the incidents of his misbehavior in 1974 with respect to female patients at Saint Elizabeths Hospital.[11]

Most of these factors show only that Ecker remains mentally ill—a fact not contested. His illness is undeniably chronic, and he does experience fantasies and turmoil. None of this necessarily bars him from conditional release. Apart from the two incidents of "misbehavior," which are exceedingly minor in nature, the only listed factor with any real bearing on dangerousness is Ecker's "uncertain ability to deal" with his fantasies. I agree that we cannot be certain about his ability to deal with them. But the real question is whether that uncertainty is so great that Ecker must be considered "dangerous" within the meaning of the statute if granted a limited conditional release.[12] The District Court must do more

11. Judge Wilkey sets forth in full the other paragraphs of the memorandum opinion which have some bearing on the District Court's conclusion. Wilkey op. at 20–21. They contain certain details of the incidents of misbehavior and they amplify the diagnosis of Ecker's condition. Beyond showing that Ecker is mentally ill, however, they shed very little light on the court's crucial dangerousness determination.

court posed questions which could as well be asked about a *court's* decision in cases like the one before us:

> "[D]angerousness" is a many splendored thing. Unless muzzled by discriminating analysis, it is likely to weigh against nominally competing considerations the way a wolf weighs against a sheep in the same scales: even if the sheep is heavier when weighed separately, somehow the wolf always prevails when the two are weighed together. Keeping dangerousness on a taut leash is especially difficult where there is danger of murder, since the danger is admittedly grave and since its improbability, which theoretically discounts its gravity, is exceedingly difficult to quantify.
>
> Moreover, once a man has shown himself to be dangerous, it is all but impossible for him to prove the negative that he is no longer a menace. The specters of the murder appellant committed 35 years ago (expiated by a long jail sentence) and the murder he may have committed more than 10 years ago obviously haunt the hospital at the very thought of granting him the least measure of freedom[.] * * * Their concern is understandable and may well be fully justified. But for all that appears, the murders and the unpredictable consequences will still be there after twenty years or after fifty. Appellant was not convicted of the second murder, and his hospitalization is not to be tacitly converted into a life sentence to John Howard.
>
> In these circumstances it is fair to ask the hospital how appellant can ever demonstrate his readiness for a less pervasive confinement: What evidence of improvement are they looking for? What is the prospect that they will ever find it? * * *

12. Judge Wilkey refers to "ambiguities and uncertainties" and to "real doubts about the sufficiency of the investigation of Ecker's condition" which he implies are just as great as when we considered the hospital's first certification for Ecker's conditional release, *United States v. Ecker (Ecker I)*, 156 U.S.App.D.C. 223, 479 F.2d 1206 (1973). Wilkey op. at 23–24. This misconstrues our holding in *Ecker I*. The major uncertainties mentioned there have been resolved: Ecker has been off medication for over two years, without untoward effects; and an elopement incident, recent at the time of *Ecker I*, has faded into the past without apparent repetition. The court in 1973 expressed lesser reservations about a third factor, the hasty testing program to which he was subjected and which yielded doubts about his control over the turmoil reflected in the tests. But it was clear after *Ecker I* what the hospital could do to provide an adequate investigation—and it has done so. The 1974 testing was not hastily undertaken to meet an artificial deadline. Though it revealed some evidence of a continued fantasy life, the uncertainty about Ecker's controls has clearly been reduced. Judge Wilkey supplies the hospital with no indication whatever of how the remaining ambiguities and uncertainties may be cleared up. If this is because they never can be cleared up, given the irreducible imprecision of psychological judgments, *see, e. g., Developments in the Law—Civil Commitment*, 87 Harv.L.Rev. 1190, 1240–1244 (1974), then Ecker is being held to a standard far stricter than Congress has chosen to impose.

to explain why it answered yes to that question, particularly in the face of the hospital's certification and a record suggesting the contrary. All four doctors who testified, including the one called by the Government, concurred in the hospital's recommendation for conditional release and the judgment that Ecker would not be dangerous under the proposed conditions. Tr. 19, 123, 163, 171, 205. There is in the record, moreover, an impressive range of evidence indicating that the vocational therapy to be provided under the proposed conditional release would yield continued improvement in Ecker's condition because it would provide the needed next step in his treatment. If his condition were to deteriorate—and the witnesses thought this un-

likely because of his improved "controls"—the deterioration would come slowly. With Ecker returning to the hospital each afternoon after class, there would be numerous "points of intervention" where the hospital could take note of the developments and initiate appropriate action.[13] Tr. 19, 54–60, 83–84, 113, 118, 123, 128, 137–140, 150, 173, 197, 203–205.

I do not suggest that the District Court was bound to accept all of this testimony.[14] It may in fact be that Ecker is too dangerous for limited release under any reasonable conditions. But if so, this court, and Ecker, and indeed the public (for the public has an important interest in the liberty of fellow citizens and in treatment to restore their

---

**13.** If the court was concerned that, despite this testimony, the hospital would not carry out faithfully its monitoring and supervisory functions as well as necessary corrective action should some deterioration appear, the court could have imposed further conditions. For example, it might have required detailed reporting to the court in such a fashion that careful monitoring and supervision would be assured.

**14.** This court has wisely held that the trier of fact is not bound by expert opinions expressed during the hearing. *United States v. McNeil*, 140 U.S.App.D.C. 228, 230, 434 F.2d 502, 504 (1970). But at the same time the trier cannot simply ride roughshod over what the experts have said. Our cases are "not authority for disregarding expert testimony. It must be considered with the other evidence, not arbitrarily rejected." *Douglas v. United States*, 99 U.S. App.D.C. 232, 239, 239 F.2d 52, 59 (1956).

That the trial court is charged with the important duty of superintending the hospital's application of the legal standards for release to the particular patient does not mean that the court may substitute its own opinions for uncontradicted expert testimony with regard to *factual* matters within the specialized competence of psychiatrists and psychologists.

\* \* \* \* \* \*

Where uncontradicted expert testimony is provided with an adequate foundation, the trier of fact may not simply pick and choose among the experts' opinions, accepting some and rejecting others according to his own personal views. \* \* \* The Supreme Court has recently reiterated the "elementary" requirement of due process that "the decision maker's conclusion \* \* \* must rest *solely* on the legal rules and evidence adduced at the hearing." \* \* \*

*United States v. McNeil, supra,* 140 U.S.App. D.C. at 240–241, 434 F.2d at 514–515 (Bazelon, C. J., concurring) (footnotes omitted) (emphasis in original), *quoting from Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287, 300 (1970).

In this light, I am not at all convinced that Judge Wilkey's characterization is correct when he says that the trial judge here did nothing more than reject "the experts' opinions on questions of law." Wilkey op. at 22. "The likelihood of future misconduct, the type of misconduct to be expected, and its probable frequency" are questions of fact. *Dixon v. Jacobs, supra* note 5, 138 U.S.App.D.C. at 325 n.17, 427 F.2d at 595 n.17. Only after the level of factual dangerousness is thus established—on the basis of the record before the court—is the court called upon to make a determination of law: whether the established likely harm is sufficient to warrant continued confinement. *Id.*

Although it is undeniably difficult to keep the two determinations distinct, it is incumbent upon us to insist that the District Court do so to the fullest extent possible. We would then have a proper basis for determining whether the District Court's factual conclusion is or is not "clearly erroneous" when viewed against the record. If the factual finding is acceptable, we may then review whether the legal standard was properly applied. Again, I do not minimize the difficulty involved. We cannot pretend to anything like mathematical application of fixed numerical scales. But we can certainly approach more closely to analytical clarity in the twofold determination demanded by proceedings for conditional release. *See Ecker I, supra* note 12, 156 U.S.App.D.C. at 226 n.9, 479 F.2d at 1209 n.9.

health, along with its obvious interest in safety), are entitled to a more complete statement indicating why the likelihood of danger was adjudged sufficiently great to bar conditional release.

Nothing in the court's holding today would prevent the District Court from supplying a more complete statement if Ecker should apply again at a later date for conditional release. And, of course, nothing in today's holding precludes a District Court from ordering conditional release later should it determine at that time that the statutory tests are met.[15]

I respectfully dissent.

## On Suggestion for Rehearing En Banc.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

### ORDER

PER CURIAM.

The suggestion of appellant Lewis C. Ecker, II for rehearing *en banc* having been transmitted to the full court and there not being a majority of the judges in regular active service in favor of having this case reheard *en banc,* it is

ORDERED by the court *en banc* that the aforesaid suggestion for rehearing *en banc* is denied.

Statement of Circuit Judge LEVENTHAL Concerning His Vote To Deny Rehearing *En Banc*

LEVENTHAL, Circuit Judge:

While the suggestion for rehearing en banc raises some interesting questions, I would find it difficult to consider them because in my view the issues have not been sufficiently focused by the record.

What I think is a more central difficulty is the problem, glimpsed in part III of Judge Wright's dissenting opinion, but not focused in a claim of error, that the trial judge has in this case disagreed with the conclusions of the only experts who gave testimony without indicating why.

This is a proceeding seeking release (or conditional release) of a person detained following a verdict that he is guilty of a serious crime but for mental illness. The trial judge has the responsibility, and he may decline relief even though all the testifying experts recommend release. But he must indicate why he comes to a different conclusion. As Judge Tamm said in another connection, the requirement of a statement of reasons—"more than a simple conclusion"—"is not onerous if the matter was dealt with in a conscientious manner in passing on the merits." *Davis v. Clark,* 131 U.S.App.D.C. 379, 380–81, 404 F.2d 1356, 1357–58 (1968).

Although this case is structured as a habeas corpus hearing with expert testimony, what is also involved is a decision by a unique agency—a hospital (here, St. Elizabeth's Hospital) holding someone detained under court order. The predicate of a hearing is that the hospital superintendent has issued a certificate, for filing with the clerk of the court, of his opinion that the person confined is entitled to release. 24 D.C. Code § 301(e). This is not a situation where the court must defer to the agency, if it is supported by substantial evidence. The hearing is before the court, the court has authority and responsibility to make the decision, and the hospital agency is only advisory. But if the machinery of government is to make sense the agency must be informed of why it is that the advice of its staff and officials has been rejected.

The forecasting of dangerousness is itself dangerous, and difficult, but the dangers and difficulties will only be increased unless the approach of the court is indicated, so that the experts of the hospital agency can adhere to that approach, or so that they can better present the situation when it is re-

---

**15.** The question before the court at such time will be Ecker's present mental state, *Rouse v. Cameron, supra* note 9, and the outcome of this proceeding by no means predetermines the decision in future proceedings.

viewed a year hence, if they believe that the judge's approach reflects a misunderstanding of their views or the underlying situation.*

Statement of Circuit Judge J. SKELLY WRIGHT, in Which Chief Judge BAZELON and Circuit Judge SPOTTSWOOD W. ROBINSON, III, Join, of Reasons for Voting for Rehearing *En Banc.*

Appellant Ecker was committed to St. Elizabeth's Hospital in 1968 after being acquitted by reason of insanity of the murder of a young woman. 24 D.C. Code § 301(d) (1973). In 1974 the hospital certified Ecker for conditional release under *id.* § 301(e) (1973) so that he could attend a vocational training school by day, returning to the hospital each night. Such training was seen as an essential step in Ecker's treatment program, since he had basically exhausted all the training opportunities available at the hospital. Testimony at the hearing firmly supported the conclusion that limited release of this kind is needed for Ecker's continued improvement. It also provided a strong showing that, as the hospital determined, Ecker is not likely to be dangerous to himself or others on conditional release. Nonetheless the District Court rejected the hospital's determination and denied release. A panel of this court affirmed.

Our cases have consistently underscored the importance of honoring a patient's right to treatment. *See, e. g., Ashe v. Robinson,* 146 U.S.App.D.C. 220, 222, 450 F.2d 681, 683 (1971); *Covington v. Harris,* 136 U.S.App.D.C. 35, 41, 419 F.2d 617, 623 (1969); *Tribby v. Cameron,* 126 U.S.App.D.C. 327, 328, 379

F.2d 104, 105 (1967); *Rouse v. Cameron,* 125 U.S.App.D.C. 366, 373 F.2d 451 (1966). Where there is a strong showing that conditional release is needed for treatment purposes, it is especially incumbent upon the District Court to make a careful, detailed, and explicit statement of its findings and reasons for denying release, both to assure that the need for treatment is properly respected and, more importantly, to aid the hospital in planning its future course. The hospital ought to know where to concentrate its future efforts so that, barring deterioration in Ecker's condition, it may some day devise an acceptable release proposal.

The conclusory findings presented by the District Court in this case give the hospital no real guidance. This failure to give adequate reasons in the face of the hospital's certificate recommending conditional release is a significant departure from the statutory scheme, which places initial responsibility for this judgment on the hospital. The statute indicates that hospital and court should work cooperatively in carrying out its purpose.

For this reason, and for the other reasons stated in my dissent from the panel opinion, I vote for rehearing *en banc.*

---

* The law, 24 D.C. Code § 301(e), specifically contemplates that at the hearing there will be submission of evidence as to mental condition of the person confined "including the testimony of one or more psychiatrists from said hospital." The law then provides that the "court shall weigh the evidence." The statute directs the court to order release if the court finds that the person has recovered his sanity and will not in the reasonable future be dangerous to himself or others. If the court does not so find,

it is directed to order the person returned to the hospital.

Even though an order of return need not be accompanied by a "finding," but rather a statement that the court does not make the "finding" necessary for release, the process is a reasoned one, with a requirement of weighing the evidence, and the reason for failure to make the finding fulfills the concept of accountability underlying government under law.