## IN THE MATTER OF THE HOSPITALIZATION OF EDWARD PATTERSON AND CHESTER BOHUK.

Superior Court of New Jersey
Law Division

Decided March 18, 1977.

516

*Mr. William F. Hyland,* Attorney General, for the State (*Ms. Elaine W. Ballai,* Deputy Attorney General, Division of Law, appearing).

*Mr. Stanley C. Van Ness,* Public Advocate, for Edward Patterson (*Mr. Walter F. Sullivan,* Assistant Deputy Public Advocate, appearing).

*Mr. Stanley C. Van Ness,* Public Advocate, for Chester Bohuk (*Ms. Julie Kligerman,* Assistant Deputy Public Advocate, appearing).

IMBRIANI, J. C. C.  The sole issue presented is whether this court should transfer a mentally ill patient, who admittedly is dangerous to either himself or others, from a maximum security mental hospital to a mental hospital with little or no security, while such patient has a detainer lodged against him. Without the detainer the transfer would undoubtedly be approved. The State opposes transfer and insists upon maximum security.

Patterson was sentenced in November 1968 to a term of 13 to 15 years for rape and assault with intent to rape. He has been confined to the Forensic Section at the Trenton Psychiatric Hospital (hereinafter the Vroom Building) on four occasions, with admission and discharge dates as follows:

| ADMISSION | DISCHARGE |
|---|---|
| December 6, 1968 | November 26, 1969 |
| February 24, 1970 | November 12, 1974 |
| May 27, 1975 | November 25, 1975 |
| March 23, 1976 | Still at Vroom |

Thus, Patterson has spent only 12 months at the Trenton State Prison and the remaining time, or approximately 375 months, at the Vroom Building. Patterson has had several parole hearings, all denied. Each Parole Board decision makes reference to his mental illness, one citing his "insight was lacking" and "judgment was defective." His present diagnosis is schizophrenia, chronic, and alcoholism. His is still psychotic, likely to act out his psychosis, and is, in the opinion of all psychiatrists who examined him, "dangerous" to himself and others.

Bohuk is serving a life sentence for murder. His incarceration began in 1950 at Trenton State Prison. He has been a patient in the Vroom Building on 13 separate occasions, the last admission being November 1976. Since January

1969 Bohuk has spent only five months at the New Jersey State Prison, the remaining time, about 95 months, at state mental hospitals, primarily Vroom. On one occasion he was transferred to the Marlboro Psychiatric Hospital, but he escaped for a short period and was returned to the New Jersey State Prison. He too has had many applications for parole, all denied. His present diagnosis is paranoid, schizophrenic, chronic undifferentiated type, and alcoholism. In the opinion of all psychiatrists who examined Bohuk, he is "dangerous" to himself and others.

Neither seeks release—merely transfer to a less restrictive mental hospital—Patterson to Ancora and Bohuk to Marlboro.

Dr. Seymour Kavin, a private psychiatrist, and Dr. Jochim Elizando, a staff psychiatrist at the New Jersey Psychiatric Hospital, testified that in their opinion neither of these two patients require maximum security confinement at the Vroom Building and both would benefit from a less restrictive environment elsewhere. They urged transfer to Marlboro or Ancora where, they say (and this is crucial) many patients are no more "dangerous" than Patterson or Bohuk.

The State offered a psychologist and a clinical psychologist from Marlboro and a psychologist from Ancora who testified that in their opinion these patients should not be transferred to their institution and should remain at the Vroom Building. They were of the opinion that neither Ancora nor Marlboro could probably provide these patients with any better care and treatment than they are presently receiving at the Vroom Building. Both testified that if transferred, these patients would be placed in open wards where escape would be easy and they would create a serious management problem. There is some suggestion that both hospitals may shortly create closed wards—nothing more than a room with locked doors and windows with bars—which may, indeed, turn out to be more restrictive to individual freedom than exists at Vroom.

All patients in our mental hospitals are either voluntary or involuntary commitments. As to voluntaries, there is no problem. As to involuntaries, the rules now require judicial reviews at the time of initial commitment, and periodically thereafter. The criterion for the commitment is whether the person is "a [probable] danger to himself or the community". R. 4:74–7(f). If so, he is confined to a mental hospital. Thus, all patients who have been involuntarily committed, whether in maximum security at Vroom or with little or no security at other hospitals for the mentally ill, have been judicially determined to be "dangerous." But the dangerousness envisaged by the rules in many cases means nothing more than that the patient is unable to cope in the outside world on his own; so he is deemed to be dangerous to himself if released. On the other hand, there are patients, such as these men, who are dangerous to others but who, if there were no detainers, would be permitted to reside in less restrictive environments than Vroom. Presumably, the theory for permitting residence at other than Vroom, is that the potential harm to the community is out-weighed by the benefits to the patient from better care and treatment.

Since we are dealing only with requests for transfer from one mental hospital to another, and not with requests for release, the concern for psychiatric predictions of dangerousness are not relevant here. See Cocozza and Steadman, "The Failure of Psychiatric Predictions of Dangerousness: Clear and Convincing Evidence, 29 *Rutgers L. Rev.* 1084 (1976). Clearly, these patients cannot be released.

I start with the finding that from all of the evidence both Patterson and Bohuk would benefit in their care and treatment if transferred to a less restrictive mental hospital. This court is unconvinced that Vroom can duplicate the care and treatment available at Marlboro and Ancora.

The patients argue that state public policy regarding mentally ill persons applies equally to all patients regardless of their criminal status. In other words, the fact that a patient is serving a sentence for conviction of a crime is ir-

relevant when he becomes a patient at any state mental hospital. He is indistinguishable from all other patients in his claim to treatment and transfer to any facility in New Jersey caring for mental patients. They seek the equal protection and treatment of our laws such as are accorded mentally ill patients who do not have a criminal charge or conviction pending. See *Baxstrom v. Herold,* 383 *U. S.* 107, 86 *S. Ct.* 760, 15 *L. Ed.* 2d 620 (1966).

We must first ask whether a person lodged in the Vroom Building is the patient of a mental hospital or an inmate of a correctional facility. If a patient, certain rights come into play which are not available to inmates.

The Vroom Building is located on the premises of Trenton Psychiatric Hospital. It is staffed by many doctors and nurses. Its external appearance is that of a hospital, but upon entry there is no mistaking the atmosphere of a prison. Entry is made through clanking, steel doors manned by guards; all windows are secured by steel bars; uniformed guards are everywhere; while some patients reside in wards, many occupy what all would recognize as cells; and there are other trappings of a prison. So what is it?

Let us review the applicable statutes. The public policy provisions which outline the application and scope of psychiatric care and treatment available to mentally ill patients in New Jersey are both explicit and egalitarian in their application. For instance, *N. J. S. A.* 30:4–24 declares that

The provisions of this Title [30] shall govern the admission and commitment of the mentally ill * * * and mentally retarded to the several *institutions* designated therefor and govern and control all phases of the relationship between such *patients* and such institutions. * * * as though each provision of this Title has been specifically enacted with relation to each institution. [emphasis supplied]

Within *N. J. S. A.* 30:4–24 lie the general principles governing the administration of mental health care under *Title* 30. This statute, it should be noted, addresses all aspects of *Title 30* and therefore is applicable to all mentally ill persons, including, it is suggested, those serving penal sentences. De-

monstrative of this is the Legislature's use of words "institutions" and "patients."

The word "institution" is defined as "any State or county institution for the care and treatment of the mentally ill * * * or the mentally retarded." *N. J. S. A.* 30:4–23. The state institutions for care and treatment of the mentally ill are enumerated in *N. J. S. A.* 30:1–7 and therein distinguished from correctional facilities. The Vroom Building is not categorized as a correctional facility for *Title* 30 purposes. In fact it is not mentioned specifically within *Title* 30 at all; rather, it would appear to be perceived as a subdivision of the Trenton Psychiatric Hospital and as such is a hospital, albeit a maximum security hospital. *Singer v. State,* 63 *N. J.* 319, 322 (1973).

A "patient" is defined to include *"any person* or persons alleged to be mentally ill. * * * or mentally retarded whose admission to any institution for the care and treatment of such class of persons in this State has been applied for." *N. J. S. A.* 30:4–23 (emphasis supplied).

■ Returning to policy, the next statute in sequence, *N. J. S. A.* 30:4–24.1, posits specific treatment ideals:

*Every individual* who is mentally ill shall be entitled to fundamental civil rights and, to medical care and other professional services in accordance with accepted standards [Emphasis supplied]

Enumerating the rights of patients, *N. J. S. A.* 30:4–24.2(e) provides that

*Each* patient receiving treatment pursuant to this Title, shall have the following rights * * * :
*        *        *        *        *        *        *        *
(2) To the least restrictive conditions necessary to achieve the purposes of treatment. [emphasis supplied]

Thus, this court holds that these men are patients, although subject to detainers, and should be treated as any other mentally ill patient. As such they have a right to the same treatment as any other patient under the least restrictive condi-

tions possible. *N. J. S. A.* 30:4-87 does not require a contrary finding.

But that is not to say they are automatically entitled to transfer to any facility caring for the mentally ill. Indeed, this court has not found, nor has it been shown, a single case that is precisely in point. As stated in *United States v. Ecker*, 543 *F.* 2d 178 (D. C. Cir. 1976), prior criminal conduct, especially if violent, is "reasonable justification" and a rational basis for differences in the *release* procedures accorded patients.

Also, when dealing with *commitments,* it was held in *State v. Krol,* 68 *N. J.* 236 (1975), that

\* \* \* the fact that the person to be committed has previously engaged in criminal acts is not a constitutionally acceptable basis for imposing upon him a substantially different standard or procedure for involuntary commitment. The labels "criminal commitment" and "civil commitment" are of no constitutional significance. [at 250-251]

Thus, the cases seem to say that all patients are to be treated alike upon *commitment,* but *release* procedures may be different and take into consideration prior criminal conduct.

This court is asked to decide whether a *transfer* from one hospital to another is to be treated akin to a commitment or release procedure. I note that there is dictum in *Baxstrom v. Herold, supra,* that

While we may assume that transfer among like mental hospitals is a purely administrative function, where, as here, the State has created functionally distinct institutions, classifications of patients for involuntary commitment to one of these institutions may not be wholly arbitrary. [383 *U. S.* at 114, 86 S. Ct. at 764, 15 *L. Ed.* 2d 625]

On November 1, 1976 the Department of Human Services promulgated Administrative Bulletin 76-5 which directs that when a patient at Vroom has been "charged or convicted" of murder (including attempt), carnal abuse, assault with intent to kill, assault with a dangerous weapon and atrocious assault and battery, *and* has a detainer lodged against him,

such detainer shall be a factor to be considered in the clinical determination of the facility to which such patient should be assigned. Periodic reviews of the individual's "continued need for security" also require review of the patient's prior criminal conduct.

The State posits that Bulletin 76–5 attempts to establish a sound basis for distinguishing between classes of criminal detainer patients, by creating a presumption of dangerousness predicated on certain types of conduct or criminal offenses which are deemed dangerous as offenses against the person.

Bulletin 76–5 specifically states that it is the responsibility of the chief executive officer of the Trenton Psychiatric Hospital to determine if an individual shall be removed from Vroom. In this case, because of the detainers, he has decided against transfer in spite of the urging of his staff. This court is asked to review that determination.

While the State does not argue that this court may not review the determination of the chief executive officer as to transfers, it should be pointed out that the law clearly supports judicial review. See *McCorkle v. Smith,* 100 *N. J. Super.* 595 (App. Div. 1968); *N. J. S. A.* 30:4–82; *R.* 4: 74–7(f).

Since *N. J. S. A.* 30:1–1 *et seq.* assumes and anticipates judicial responsibility to select and ensure maintenance of a patient at an appropriate facility, it follows that this court may fashion release to a less restrictive environment if the case so requires.

There are several problems raised by Administrative Bulletin 76–5. For instance, why are persons *charged* with a crime grouped with those *convicted?* What happened to the presumption of innocence? How did the Department of Human Services settle upon the type of criminal offenses (seven in all) which must be considered upon requests for transfer from Vroom to a hospital with little or no security? Why are patients charged or convicted of impairing the morals of a child, treason, robbery or incest (not to mention other

crimes) treated less severely than those charged or convicted of atrocious assault and battery?

To the question, why doesn't this court declare all or a part of Bulletin 76-5 unconstitutional if it has these concerns, the short answer is that this court has no jurisdiction to decide that question. The proper forum is the Appellate Division. See *Pascucci v. Vagott*, 71 *N. J*. 40, 52 (1976); *R*. 2:2-3 and *R*. 2:2-4.

*Wolff v. McDonnell*, 418 *U. S*. 539, 556, 94 *S. Ct*. 2963, 2974, 41 *L. Ed*. 2d 935 (1974), asserted that "prisoners may * * * claim the protections of the Due Process Clause. They may not be deprived of life, liberty or property without due process of law." Patients of a mental hospital are entitled to no less. While constitutional principles do not compel that all be treated equally, it does compel a showing of a rational basis for difference of treatment. *State v. Krol*, *supra* 68 *N. J*. at p. 253. And the State must clearly demonstrate its reasons for different treatment. Absent reasons, dissimilar treatment will not be tolerated. "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, *supra* 418 *U. S*. at 558, 94 *S. Ct*. at 2976.

Suffice it to say that there are innumerable obstacles to the State's position posed by Bulletin 76-5. But this court does not have to meet them. I find as a fact that the only reason that Patterson and Bohuk have been denied parole (and therefore still have detainers filed against them) is because they are suffering from a mental illness. They should have been granted parole previously. If this happened they would be civil commitments and the transfers would have been approved automatically.

It is intolerable that the State could deny parole because of a mental illness (compelling these patients to remain at Vroom), then resist transfer from Vroom because a detainer exists. The result of the State's action is to condemn these patients to permanent commitment to Vroom. This is repugnant to basic fairness and justice. When a

patient at Vroom, who is serving a sentence for a crime, is denied parole solely because he is suffering from a mental illness, and a detainer continued, this court should treat such detainer as a nullity in a proceeding for transfer from Vroom to a less restrictive environment. Patterson and Bohuk shall be treated, under the facts herein presented, as any other civil patient in their applications for transfer to a less restrictive environment. This court holds that Bulletin 76–5 has been incorrectly applied to the present matters. At best, Bulletin 76–5 can only apply to a patient at Vroom who is serving a sentence for a crime and who has not been denied bail solely due to his mental illness.

The transfer applications of Patterson to Ancora, and Bohuk to Marlboro, are granted.